Jon B. Fougner (State Bar No. 314097)
jon@fougnerlaw.com
600 California Street, 11th Floor
San Francisco, California 94108
Telephone: (415) 577-5829
Facsimile: (206) 338-0783

[Additional counsel appear on signature page]

*Attorneys for Plaintiff Deborah Schick and the Proposed Classes*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| DEBORAH SCHICK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>CALIBER HOME LOANS, INC., NEXLEVEL DIRECT LLC, DRIVING FORCE MEDIA, and BARRY GABSTER,<br><br>Defendants. | Case No. 3:20-cv-617<br><br>**FIRST AMENDED COMPLAINT FOR INJUNCTION AND DAMAGES**<br><br>**Class Action**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Deborah Schick, by her undersigned counsel, for this class action complaint against Defendants Caliber Home Loans Inc., NexLevel Direct LLC, Driving Force Media, Barry Gabster, and their present, former, and future direct and indirect parent companies, subsidiaries, affiliates, and agents, alleges as follows:

## I.   INTRODUCTION

1. Nature of Action: This case arises from Defendants' repeated, automated, unsolicited telemarketing in violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA").

2. The telemarketing was conducted using automated telephone dialing systems ("ATDSs"), a tactic among those that inspired Congress to enact the TCPA and that most infuriate consumers to this day.

3. In 2017, Caliber Home Loans entered into a classwide settlement of claims of violating the TCPA.

4. Rather than reforming, however, it has continued to hire illegal telemarketers to fuel its sales.

5. Driving Force Media uses illegal, unsolicited telemarketing to generate leads, including to consumers on the NDNCR, in violation of the TCPA and other federal law.

## II.   PARTIES

6. Plaintiff Deborah Schick is a natural person.

7. Caliber Home Loans is a corporation.

8. It is a Delaware corporation.

9. It conducts mortgage servicing and origination in California.

10. It has more than 60 offices in California, including in this District.

11. NexLevel Direct LLC is a limited liability company.

12. It is an Illinois limited liability company.

13. It has its principal place of business in Bainbridge Island, WA.

14. Driving Force Media is an unincorporated marketing agency and call center.

15. It is located in Orange County, CA.

16. Driving Force Media is operated by Barry Gabster.

17. Driving Force Media is the alter ego of Mr. Gabster.

## III.   JURISDICTION AND VENUE

18. <u>Jurisdiction</u>: This Court has federal-question subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

19. <u>Personal Jurisdiction</u>: This Court has personal jurisdiction over Defendants because:

    a.    they have continuous business contacts in California;

b.     their conduct at issue took place in California; and

c.     Defendants' conduct at issue intentionally and repeatedly targeted Plaintiff while she was California, at her telephone number, which bears a California area code.

20. <u>Venue</u>: Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiff's claims—namely, the calls to Plaintiff's cellular telephone—occurred in this District.

21. <u>Intradistrict Assignment</u>: Assignment to this Division is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events or omissions that give rise to Plaintiff's claims—namely, the calls to Plaintiff's telephone—occurred in this Division.

## IV.   FACTS

**A.   The Enactment of the TCPA and Its Regulations**

22. <u>Robocalls Outlawed</u>: Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1). Calls made by an ATDS or with a prerecorded or artificial voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein. Encouraging people to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

23. <u>Rationale</u>: In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

24. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

25. <u>Prior Express Written Consent</u>: The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted).

26. <u>Do Not Call Registry</u>: Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the National Do Not Call Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Encouraging people to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).

**B.    The Worsening Problem of Robocalls**

27. Unfortunately, the problems Congress identified when it enacted the TCPA have only grown worse in recent years.

28. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

29. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

30. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

31. In 2017, the FTC received 4,501,967 complaints about robocalls, up from 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

32. The harm from of illegal robocalls is "is at least $3 billion per year from lost time alone." Babette Boliek & Eric Burger, *Beating Back Unwanted Robocalls*, FCC (June 5, 2019), https://www.fcc.gov/news-events/blog/2019/06/05/beating-back-unwanted-robocalls (statement of FCC Chief Economist and FCC Chief Technology Officer).

33. In fact, the harm is much greater than the time lost outright, because "little surges of the stress hormone cortisol" from interruptions from smartphones result in elevated heart rates, sweaty hands, tightened muscles, anxiety and distraction, a "switch cost" that weighs on a person even after the interruption ends, reducing his or her efficiency by 40%. Stephanie Stahl, *Constant Interruptions From Smartphone Can Impact Brain Chemistry, Scientists Say*, CBS Philly (May 29, 2018), https://philadelphia.cbslocal.com/2018/05/29/scientists-constant-interruptions-smartphone-impact-brain-chemistry/.

**C.     Barry Gabster Owns and Operates Driving Force Media**

34. Barry Gabster is the operator and owner of Driving Force Media.

35. At times material to this Complaint, acting alone or in concert with others, Barry Gabster has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of Driving Force Media.

36. Barry Gabster has formulated, directed, had the authority to control, and participated in the acts or practices of Driving Force Media, including the acts and practices set forth in this complaint.

37. Mr. Gabster chooses the dialing equipment used by Driving Force Media to place telemarketing calls.

38. Mr. Gabster oversees the scripts used by Driving Force Media to make telemarketing calls.

**D.     Defendants' Unsolicited, Automated Telemarketing to Plaintiff Deborah Schick**

39. Plaintiff Deborah Schick is, and at all times mentioned herein was, a "person" as defined by 47 U.S.C. § 153(39).

40. She uses the phone number that begins "(925) 735" (the "Deborah Schick Phone Number").

41. The Deborah Schick Phone Number is assigned to a cellular telephone service.

42. The Deborah Schick Phone Number has been on the National Do Not Call Registry since April 11, 2004.

43. The Deborah Schick Phone Number is a residential telephone line used for personal purposes.

44. The Deborah Schick Phone Number is not associated with any business.

45. Plaintiff Deborah Schick never consented to receive calls from Defendants.

46. She never did business with Defendants.

47. To generate leads for Caliber Home Loans, Driving Force Media called the Deborah Schick Phone Number on November 21, 2019, and November 26, 2019.

48. Both calls followed the same pattern.

49. Both calls showed a caller ID from this Division: (925) 315-8286.

50. Ms. Schick said "hello" multiple times when she answered each call.

51. There was no human being on the other end of the line when she said "hello."

52. On each call, she heard a distinctive click and pause, indicating that the call had been autodialed.

53. Each call was a telemarketing call promoting Caliber Home Loans and its products.

54. On the November 21 call, Ms. Schick asked the caller to stop calling and disconnected the call.

55. However, Defendants called her again just five days later, on November 26.

56. During the November 26 call, Ms. Schick spoke with Zain Subhani, NMLS#1852329, Caliber Home Loans's Senior Loan Consultant.

57. Ms. Schick then received an e-mail from "zain.subhani@caliberhomeloans.com."

**E.     The Invasion of Privacy Caused by Defendants' Automated Telemarketing**

58. Before directing their automated telemarketing to her, Defendants never did anything to confirm that Plaintiff had provided prior express written consent to their telemarketing.

59. The conduct alleged herein:

    a.  invaded the privacy and solitude of Plaintiff and proposed class members;

    b.  was highly offensive to Plaintiff and proposed class members;

    c.  interrupted the train of thought of Plaintiff and proposed class members;

    d.  wasted the time of Plaintiff and proposed class members;

    e.  annoyed and harassed Plaintiff and proposed class members; and

    f.  consumed the battery life of the cellular telephones of Plaintiff and proposed class members.

**F.     Caliber Home Loans Is Vicariously Liable for Driving Force Media's Violations**

60. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

61. In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

62. The FCC has instructed that sellers such as Caliber Home Loans may not avoid liability by outsourcing telemarketing to third parties, such as Driving Force Media:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

63. In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

64. Caliber Home Loans is liable for telemarketing calls placed by Driving Force Media to generate leads for Caliber Home Loans.

65. Caliber Home Loans has previously been sued for TCPA violations and has settled at least one case as a class action. *Ashack v. Caliber Home Loans, Inc.*, No. 1:15-cv-01069-JMS-DML, 2017 U.S. Dist. LEXIS 92881 (S.D. Ind. June 16, 2017).

66. Caliber Home Loans hired NexLevel Direct, a company that used Driving Force Media to originate new business for Caliber Home Loans using telemarketing calls.

67. Caliber Home Loans controls the day-to-day activities of Driving Force Media's telemarketing through NexLevel Direct.

68. Caliber Home Loans restricts the geographic footprint into which its telemarketing vendors, including Driving Force Media, can call.

69. Caliber Home Loans instructs its telemarketers, including Driving Force Media, regarding certain numbers that they should or should not call.

70. Caliber Home Loans knew or reasonably should have known that Driving Force Media was violating the TCPA on Caliber Home Loans's behalf but Caliber Home Loans failed to take effective steps within its power to cause Driving Force Media to stop.

71. A reasonable seller that accepts telemarketing leads from lead generators whose leads are challenged in TCPA litigation or otherwise would and should investigate to ensure that the calls were made in compliance with the TCPA.

72. Caliber Home Loans is aware of Driving Force Media's abusive conduct but continues its relationship with it, via NexLevel Direct.

73. The 2013 FCC ruling holds that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *In re DISH Network*, 28 FCC Rcd. 6592-93 ¶ 46.  Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

### V.   CLASS ACTION ALLEGATIONS

74. Pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3), Plaintiff brings this case on behalf of two classes.

75. <u>Cellular Telephone Class Definition</u>: The "Cellular Telephone Class" is defined as follows: All persons in the United States to whom:

    a.    Defendants, any of them and/or a third party acting on any of their behalf made a call or sent a text message;

    b.    to a cellular telephone number;

    c.    using an ATDS or an artificial or prerecorded voice;

        d.    during the period that begins four years before the filing of the original complaint in this action and ends on the first day of trial.

76. Plaintiff is a member and proposed representative of the Cellular Telephone Class.

77. <u>DNC Class Definition</u>: The "DNC Class" is defined as follows: All persons in the United States to whom:

        a.    Defendants, any of them and/or a third party acting on any of their behalf made a call or sent a text message;

        b.    to a residential (including residential cellular) telephone number listed on the NDNCR for at least 31 days before at least two of such communications in a 12-month period;

        c.    for telemarketing purposes;

        d.    during the period that begins four years before the filing of the original complaint in this action and ends on the first day of trial.

78. Plaintiff is a member and proposed representative of the DNC Class.

79. Excluded from the classes are Defendants, any entity in which Defendants (or any of them) have a controlling interest or that has a controlling interest in Defendants (or any of them), Defendants' legal representatives, assignees, and successors, the judges to whom this case is assigned and the employees and immediate family members of all of the foregoing.

80. The classes are so numerous that joinder of all their members is impracticable.

81. Caliber Home Loans is among the largest loan servicing companies in the United States.

82. Placing a robocall costs less than one cent.

83. Therefore, Defendants could afford to, and did, send thousands of robocalls.

84. There were approximately 244,685 settlement class members in the *Ashack v. Caliber Home Loans* TCPA litigation.

85. Outcome-determinative questions of fact and law have the same answers for all class members. These questions include but are not limited to the following:

a. What are the relationships amongst Defendants? (Mr. Gabster and Driving Force Media are each other's alter ego, and they are the agents and sub-agents of Caliber Home Loans.)

b. Did Defendants call the Cellular Telephone Class member at a cellular telephone number? (Yes.)

c. Did Defendants call the Cellular Telephone Class member using an ATDS and/or an artificial or prerecorded voice when calling the class member? (Yes.)

d. Did Defendants call the DNC Class member at a residential (including residential cellular) telephone number listed on the NDNCR for at least 31 days before at least two of such communications in a 12-month period? (Yes.)

e. Was the purpose of the calls to the class member telemarketing? (Yes.)

f. Were the calls to the class member necessitated by an emergency? (No.)

g. Did Defendants call the class member on a date such that the class member's TCPA claim was not time-barred on the date that the original complaint in this action was filed? (Yes.)

h. Had the class member provided prior express written consent before being called? (No.)

i. What is the minimum statutory damages per violation the class member is entitled to? ($500.)

j. Were Defendants' violations of the class member's rights under the TCPA knowing or willful? (Yes.)

k. How much statutory damages per violation should the Court award the class member? ($1,500.)

l. Should Defendants be enjoined? (Yes.)

86. Plaintiff's claims are typical of the claims of the classes. Plaintiff's claims and those of the classes arise out of the same course of conduct by Defendants and are based on the same legal and remedial theories.

87. Plaintiff will fairly and adequately protect the interests of the classes. Plaintiff has retained competent and capable counsel experienced in TCPA class action litigation. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the classes and have the financial resources to do so. The interests of Plaintiff and her counsel are aligned with those of the proposed classes.

88. The common issues arising from this conduct that affect Plaintiff and members of the classes predominate over any individual issues, making a class action the superior means of resolution. Adjudication of these common issues in a single action has important advantages, including judicial economy, efficiency for class members, and classwide *res judicata* for Defendants. Classwide relief is essential to compel Defendants to comply with the TCPA.

89. The interest of individual members of the classes in individually controlling the prosecution of separate claims against Defendants is small because the damages in an individual action (up to $1,500 per TCPA violation) are dwarfed by the cost of prosecution.

90. The forum is a desirable, efficient location in which to resolve the dispute. The Northern District has experience managing TCPA class litigation to a jury verdict and resulting judgment.

91. No significant difficulty is anticipated in the management of this case as a class action. Management of the claims at issue is likely to present fewer difficulties than are presented in many class actions because the calls at issue are automated (and thus uniform) and because the TCPA articulates bright-line standards for liability and damages.

92. Defendants have acted on grounds generally applicable to the classes, thereby making final injunctive relief and corresponding declaratory relief appropriate on a classwide basis.

### VI.  FIRST CLAIM FOR RELIEF
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)—Robocalling)**
**On Behalf of Plaintiff and the Cellular Telephone Class**
**Against All Defendants**

93. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

94. Defendants and/or their affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to the cellular telephone numbers of Plaintiff and members of the Cellular Telephone Class using an ATDS and/or artificial or prerecorded voice without prior express written consent.

95. Plaintiff and members of that class are entitled to an award of $1,500 in damages for each knowing or willful violation and $500 in damages for each other violation.

96. Plaintiff and members of that class are also entitled to and do seek an injunction prohibiting Defendants and all those in active concert or participation with them from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls (including text messages) to any cellular telephone number using an ATDS and/or artificial or prerecorded voice.

## VII.   SECOND CLAIM FOR RELIEF
**(Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(c)—Telemarketing)**
**On Behalf of Plaintiff and the DNC Class**
**Against All Defendants**

97. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

98. Defendants and/or its affiliates or agents violated the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing multiple unsolicited telemarketing calls (including text messages) within a 12-month period to the residential (including residential cellular) telephone numbers of Plaintiff and members of the DNC Class even though those numbers had been listed on the NDNCR for at least 31 days.

99. Plaintiff and members of that class are entitled to an award of $1,500 in damages for each knowing or willful violation and $500 in damages for each other violation.

100.   Plaintiff and members of that class are also entitled to and do seek an injunction prohibiting Defendants and all those in active concert or participation with them from violating the TCPA, 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2), by placing unsolicited telemarketing calls (including text messages) to any telephone number listed on the NDNCR for at least 31 days.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of all members of the classes, prays for judgment against Defendants as follows:

    A.    Certification of the proposed classes;

    B.    Appointment of Plaintiff as representative of the classes;

    C.    Appointment of the undersigned counsel as counsel for the classes;

    D.    A declaration that actions complained of herein violate the TCPA;

    E.    An order enjoining Defendants and all those in active concert or participation with them from engaging in the conduct set forth herein;

    F.    An award to Plaintiff and the classes of damages, as allowed by law;

    G.    An award to Plaintiff and the classes of costs and attorneys' fees, as allowed by law or equity;

    H.    Leave to amend this complaint to conform to the evidence presented at trial; and

    I.    Orders granting such other and further relief as the Court deems necessary, just, and proper.

## IX. DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

## X. SIGNATURE ATTESTATION

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from each of its other signatories.

RESPECTFULLY SUBMITTED AND DATED this 3rd day of August, 2020.

By: *Anthony I. Paronich*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Anthony I. Paronich, *Pro Hac Vice*
anthony@paronichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Edward A. Broderick, *Pro Hac Vice*
ted@broderick-law.com
BRODERICK LAW, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Matthew P. McCue, *Pro Hac Vice*
mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

Andrew W. Heidarpour, *Pro Hac Vice*
aheidarpour@hlfirm.com
HEIDARPOUR LAW FIRM, PPC
1300 Pennsylvania Avenue NW, 190-318
Washington, District of Columbia 20004
Telephone: (202) 234-2727

*Attorneys for Plaintiff Deborah Schick and the Proposed Classes*