David T. Biderman, Bar No. 101577
DBiderman@perkinscoie.com
Kristine E. Kruger, Bar No. 253593
KKruger@perkinscoie.com
Thomas N. Abbott, Bar No. 245568
TAbbott@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105-3204
Telephone: 415.344.7000
Facsimile: 415.344.7050

Attorneys for Defendant
Caliber Home Loans, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DEBORAH SCHICK, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>CALIBER HOME LOANS, INC., NEXLEVEL DIRECT LLC, DRIVING FORCE MEDIA, and BARRY GABSTER,<br><br>     Defendants. | Case No. 3:20-cv-00617-VC<br><br>DEFENDANT CALIBER HOME LOANS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF<br><br>Judge:     Hon. Vince Chhabria<br>Hearing Date:  September 2, 2021<br>Hearing Time:  2 p.m.<br>Hearing Location: Courtroom 4, 17th Floor<br>        San Francisco Courthouse |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT TO THE COURT, ALL PARTIES, AND COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on September 2, 2021, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Judge Vince Chhabria, in Courtroom 4, Floor 17, United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, Defendant Caliber Home Loans, Inc. ("Caliber") will and hereby does move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on Plaintiff's claim of violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c). Plaintiff's TCPA claim fails as a matter of law for four, independent reasons. First, Schick cannot establish a private right of action under § 227(c) because the record shows that Caliber was involved in only one call. Second, Plaintiff lacks Article III standing because her self-inflicted harm is neither concrete nor fairly traceable to Caliber. Third, as Plaintiff admits, Caliber did not make the telephone calls at issue in this case so it is not directly liable. And fourth, Caliber did not exercise control over the third party that placed those calls, thus defeating Plaintiff's claim for vicarious liability.

This Motion is based on this Notice of Motion and Motion for Summary Judgment, the accompanying Memorandum of Points and Authorities, the Declarations of Bill Borneman ("Borneman Decl."), Thomas N. Abbott ("Abbott Decl."), Barry Gabster ("Gabster Decl."), and Matthew Kopil ("Kopil Decl."), the Depositions of Deborah Schick[1] ("Schick Depo."), Matthew Kopil[2] ("Kopil Depo."), and Sydney Naiman[3] ("Naiman Depo."), the pleadings and other documents filed in this case, any matters of which the Court may take judicial notice, any oral argument that may be presented on this Motion, and such further evidence or argument as the Court may allow.

---

[1] *See* Abbott Decl., Ex. E
[2] *See* Abbott Decl., Ex. F
[3] *See* Abbott Decl., Ex. G

1

## **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................... 1

II.   STATEMENT OF FACTS ....................................................................... 2

    A.   Caliber Enters Into a Contract with NLD to Purchase Leads .................. 2

    B.   Schick's Practice to Generate TCPA Claims ......................................... 3

    C.   Caliber Learned of Schick's Allegations and Terminated Its Purchase of Leads from NLD When NLD Failed to Provide Evidence That It Sold TCPA-Compliant Leads to Caliber ............................................................. 6

III.  LEGAL STANDARD ............................................................................... 7

IV.  LEGAL ARGUMENT .............................................................................. 8

    A.   Summary Judgment Should Be Granted Because the Record Shows That Caliber Was Involved In Only One Call ................................................... 8

    B.   Summary Judgment Should Be Granted Because Schick Lacks Standing ........... 9

        1.   Schick Lacks Article III Standing ............................................... 9

            a.   Schick's Purported Injury is Not Traceable to Caliber ................... 9

            b.   Schick's Purported Injury is Not Concrete .................................... 12

        2.   Schick Lacks Prudential Standing Because She is Not Within the TCPA's Zone of Interests ...................................................... 13

    C.   Summary Judgment Should Be Granted Because Caliber Did Not Initiate Either Call and is Not Vicariously Liable for DFM's Actions ............................. 15

        1.   Caliber is Not Directly Liable for DFM's Calls Because Caliber Did Not Make Or Initiate a Call to Schick ................................... 15

        2.   Caliber is Not Vicariously Liable to Schick for Calls Made by DFM Because There is No Agency Relationship Between Caliber and DFM .... 17

            a.   DFM Did Not Have Actual Authority to Place Calls On Caliber's Behalf ............................................................. 17

            b.   DFM Did Not Have Apparent Authority from Caliber................... 18

            c.   Caliber Did Not Ratify DFM's Unlawful Calls ............................ 20

            d.   Caliber Did Not Exercise Sufficient, Or Any, Control Over DFM for Liability Based On Respondeat Superior....................... 21

V.   CONCLUSION ...................................................................................... 24

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*,
   No. 18-CV-07311-VC, 2019 WL 6907077 (N.D. Cal. Dec. 19, 2019) ........................15, 18, 20

4

5

*Adzhikosyan v. Callfire, Inc.*,
   No. CV 19-246 PSG, 2019 WL 7856759 (C.D. Cal. Nov. 20, 2019) ................................15, 16

6

7

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .................................................................................................................7

8

*Angle v. Miller*,
   673 F.3d 1122 (9th Cir. 2012) .................................................................................................7

9

10

*Barr v. Am. Ass'n of Pol. Consultants, Inc*,
   140 S. Ct. 2335 (2020) ...........................................................................................................14

11

*Buchholz v. Meyer Njus Tanick, PA*,
   946 F.3d 855 (6th Cir. 2020) .................................................................................................11

12

13

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*,
   213 F.3d 474 (9th Cir. 2000) ...................................................................................................7

14

15

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.*,
   227 F.R.D. 313, 321-325 (C.D. Cal. 2004) ............................................................................24

16

*Campbell-Ewald Co. v. Gomez*,
   577 U.S. 153 (2016) ...............................................................................................................17

17

18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................................................7, 24

19

20

*E. Bay Sanctuary Covenant v. Biden*,
   993 F.3d 640 (9th Cir. 2021) (Bumatay, C.J., dissenting) .......................................................9

21

*Eliahu v. Israel*,
   No. 14-CV-01636-BLF, 2015 WL 981517 (N.D. Cal. Mar. 3, 2015) ....................................11

22

23

*Flast v. Cohen*,
   392 U.S. 83 (1968) ...................................................................................................................9

24

25

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) ...............................................................................................12

26

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) .................................................................................................................9

27

28

*Garcia v. Credit One Bank, N.A.*,
    2020 WL 4431679 ...............................................................................................13, 14

*Grigorian v. FCA US LLC*,
    2020 WL 7238392 (11th Cir. Dec. 9, 2020) ....................................................10, 12

*Hill v. Nat'l Collegiate Athletic Assn.*,
    7 Cal. 4th 1 (1994) ........................................................................................................13

*In re Joint Petition Filed by Dish Network, LLC*,
    28 F.C.C. Rcd. 6574 (2013) ...........................................................................15, 18, 19

*In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*,
    223 F. Supp. 3d 514 (N.D.W. Va. 2016) .................................................................20

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010)..........................................................................................7

*Inclusive Communities Project, Inc. v. Dep't of Treasury*,
    946 F.3d 649 (5th Cir. 2019)........................................................................................11

*Johansen v. HomeAdvisor, Inc.*,
    218 F. Supp. 3d 577 (S.D. Ohio 2016).......................................................................19

*Jones v. Royal Admin. Servs., Inc.*,
    887 F.3d 443 (9th Cir. 2018)..................................................................................17, 21

*Jones v. Williams*,
    791 F.3d 1023 (9th Cir. 2015)...................................................................................7, 22

*Kristensen v. Credit Payment Servs. Inc.*,
    879 F.3d 1010 (9th Cir. 2018)......................................................................................20

*Kristensen v. Credit Payment Servs. Inc.*,
    No. 2:12-CV-00528-APG, 2015 WL 4477425 (D. Nev. July 20, 2015) ............19, 21

*Lowry v. City of San Diego*,
    858 F.3d 1248 (9th Cir. 2017).........................................................................................7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ..........................................................................................................7

*Meeks v. Buffalo Wild Wings, Inc.*,
    No. 17-CV-07129-YGR, 2018 WL 1524067 (N.D. Cal. Mar. 28, 2018) ................15

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014)................................................................................11, 14

*Mey v. Got Warranty, Inc.*,
    193 F. Supp. 3d 641 (N.D.W. Va. 2016) ..................................................................13

*Naiman v. TranzVia LLC*,
   No. 17-CV-4813-PJH, 2017 WL 5992123 (N.D. Cal. Dec. 4, 2017) ........................................15

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
   710 F.3d 71 (2d Cir. 2013) ........................................................................................................11

*Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*,
   18 F.3d 1468 (9th Cir. 1994) .......................................................................................................7

*Sanchez-Scott v. Alza Pharms.*,
   86 Cal. App. 4th 365 (2001) ......................................................................................................13

*Sheski v. Shopify (USA) Inc.*,
   No. 19-CV-06858-HSG, 2020 WL 2474421 (N.D. Cal. May 13, 2020) ................................16

*State v. U.S. Env't Prot. Agency*,
   989 F.3d 874 (10th Cir. 2021) ...................................................................................................11

*Stoops v. Wells Fargo Bank, N.A.*,
   197 F. Supp. 3d 782 (W.D. Pa. June 24, 2016) ...................................................................13, 14

*tagTrends, Inc. v. Nordstrom, Inc.*,
   No. SACV1300563JVSJPRX, 2014 WL 12561604 (C.D. Cal. Sept. 30, 2014) .....................24

*Thomas v. Taco Bell Corp.*,
   582 F. App'x 678 (9th Cir. 2014) .................................................................................15, 20, 21

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021) ............................................................................................................9, 12

*Trunk v. City of San Diego*,
   660 F.3d 1091 (9th Cir. 2011), *cert. denied*, 567 U.S. 944 (2012) ...........................................7

*United States v. $133,420 in U.S. Currency*,
   672 F.3d 629 (9th Cir. 2012) .......................................................................................................7

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ...................................................................................................................14

**STATUTES**

Telephone Consumer Protection Act, 47 U.S.C. § 227 ........................................................ passim

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I.       INTRODUCTION

3       The Court should grant summary judgment in favor of Caliber and against Plaintiff Deborah

4  Schick ("Schick") for several independent reasons, each of which is ample grounds for relief.

5       First, Caliber is not liable under 47 U.S.C. § 227(c) because Caliber was involved in only a

6  single call to Schick. The private right of action under § 227(c) requires proof that Schick received

7  *more than* one telephone call by or on Caliber's behalf within any 12-month period. The record

8  shows that Caliber was involved only in the November 26th call.

9       Second, Schick lacks standing to pursue her claim because she actively sought out the

10  contact on which her lawsuit is based. Schick alleges that Caliber violated the Telephone Consumer

11  Protection Act, 47 U.S.C. § 227 ("TCPA") because of two calls she answered in November 2019.

12  The record establishes that Caliber was involved in only one call, on November 26, 2019, and that

13  Schick purposely prolonged that call so that the caller, Defendant Driving Force Media ("DFM"),

14  would transfer the call to Caliber on Schick's behalf. Caliber itself did not initiate or make any calls

15  to Schick. Moreover, the only reason DFM ultimately transferred the November 26 call to Caliber

16  was because Schick induced DFM to do so, by falsely claiming that she wanted to refinance a

17  property in San Ramon, CA that she no longer owned. Schick's claim is thus based on her self-

18  inflicted "injury" and she lacks Article III standing to prosecute this action against Caliber.

19       Third, Caliber did not call Schick so Caliber did not make or initiate the call and cannot be

20  directly liable under the TCPA.

21       Fourth, Caliber is not vicariously liable for any violations by DFM. To establish vicarious

22  liability, Schick must show there was an agency relationship between Caliber and DFM. The record

23  shows she cannot do so. To the contrary, Caliber exerted no control of any sort over DFM, a

24  subcontractor with which Caliber had no privity or knowledge, and whose involvement Caliber

25  never would have endorsed. Caliber had a carefully limited contractual arrangement with a different

26  entity, Defendant NexLevel Direct LLC ("NLD"), whose job it was to obtain potential customer

27  leads for Caliber. Caliber's contract with NLD obligated NLD to comply with all pertinent laws in

28  the acquisition of these leads, and included an express promise to provide only "TCPA compliant"

- 1 -

leads. Caliber's contract with NLD also required NLD to seek Caliber's express pre-approval of any contractor that NLD wanted to use in providing these leads. Despite these promises, NLD hired DFM without Caliber's knowledge or consent. The moment that Caliber learned NLD had done so, Caliber terminated its contract with NLD. These facts are established by evidence from NLD, DFM, and Caliber, and Schick has not and cannot dispute them.

For all these reasons, summary judgment should be entered in Caliber's favor on Schick's only remaining TCPA claim.

## II.        STATEMENT OF FACTS

### A.        Caliber Enters Into a Contract with NLD to Purchase Leads

Caliber originates home mortgage loans in all 50 states and the District of Columbia. Kopil Decl. ¶ 2. Most of its new originations come from existing relationships. *Id*. A small portion of new originations come from live transfer leads Caliber purchases from lead providers such as NLD. *Id*. A live transfer is the process of handing off a live call between a lead and a lead provider to the purchaser who then takes over the call to speak with the lead. *Id*. ¶ 11.

In 2019, Caliber entered into agreements with NLD for live transfer leads. Kopil Decl. ¶ 11. In these agreements, NLD promised Caliber that its live transfer leads would comply with the TCPA and applicable do-not-call ("DNC") lists. *Id*. ¶ 12. These promises were embodied in at least two places in the relevant contracts between Caliber and NLD. *Id*.

First, the parties' Master Products and Services Agreement ("MPSA") provides that, in the provision of leads, NLD will comply with "all applicable federal, state, and local laws, regulations and ordinances." Kopil Decl. ¶ 13, Ex. A § 2(a)(i); Borneman Decl., Ex. 1 § 2(a)(i).

Second, the parties' Statement of Work ("SOW") states that NLD will provide Caliber only leads from "TCPA compliant data records." Kopil Decl. ¶ 14, Ex. B at p. 1; Borneman Decl., Ex. 2 at p. 1.

NLD also promised not to use any third parties without first letting Caliber know. Kopil Decl. ¶ 15. Specifically, the MPSA provides that NLD will not allow any subcontractor or entity other than NLD to perform or provide leads to Caliber without prior written consent from Caliber. *Id*., Ex. A § 2(b); Borneman Decl., Ex. 1 § 2(b).

Caliber relied on NLD's promises when making the decision to purchase live transfer leads from NLD. Kopil Decl. ¶ 16; Kopil Depo. at 19:3-5 ("What did you hire NexLevel to do?" … "To provide leads to Caliber for refinanced mortgages."). Caliber would not have purchased any live transfer leads from NLD if NLD had not agreed to provide leads compliant with the TCPA and DNC. Kopil Decl. ¶ 17.

Because Caliber contracted only with NLD and prohibited subcontracting without prior express approval, Caliber had no control over any of NLD's services or over DFM. Kopil Decl. ¶ 18. For example, Caliber did not provide NLD or DFM with any telephone data and did not cause NLD or DFM to call any phone numbers. *Id*. ¶ 19. And Caliber's involvement in any particular call began only after Caliber received a call from NLD with a potential client. *Id*. ¶ 20. NLD provided leads to multiple entities so NLD calls became calls on behalf of Caliber only *after* the decision was made by NLD to transfer a lead to Caliber. *Id*. ¶ 21. In fact, Caliber had no control or knowledge regarding how NLD obtained the leads. *Id*. Caliber knew "very little" because NLD used a "proprietary model." Kopil Depo. at 19:15-18, 59:4-11 (explaining that NLD referred to their process as proprietary in the SOW), 69:17-24, 106:15-22. What Caliber did know was that NLD promised to provide "TCPA compliant" leads and promised to provide them itself—not through a subcontractor. Kopil Decl. ¶ 14, Ex. B at p. 1 & Ex. A § 2(b); Borneman Decl., Ex. 1 § 2(b) & Ex. 2 at p. 1.

**B.    Schick's Practice to Generate TCPA Claims**

Deborah Schick is an experienced TCPA plaintiff.[4] She has filed approximately 60 TCPA actions since 2015. Schick Depo. at 230:20-25. Schick admits that she purposefully prolongs telephone calls she believes would support a TCPA claim. *Id*. at 162:10-24, 186:21-187:5, 218:22-219:7, 219:25-220:3. Schick estimates that she has prolonged phone calls for a claim "[a]t least a hundred times." *Id*. at 106:25-107:6. Thus, when Schick received a call relating to mortgage financing, she feigned interest "to find out who was the mortgage company." *Id*. at 99:17-22.

---

[4] Although Schick is experienced in filing putative class actions under the TCPA she was not aware of any case she filed in which a class was certified. Schick Depo. at 230:17:22 ("Q. … Have you ever certified a class in any of the TCPA cases that you filed? A. Not that I'm aware of.").

Schick received phone calls from DFM on November 21 and 26, 2019. FAC ¶¶ 40-41, 47, 49; Schick Depo. at 140:6-9 (testifying that DFM initiated the phone calls); Kopil Decl. ¶¶ 3-4 (Caliber placed neither call). On the November 26th call, Schick pretended to be interested in a refinance loan as a ruse to convince DFM representative, Adam Kinsella, to transfer the call:

> Q.   All right. So, in November 2019, did you have a loan on the Satin Leaf Way property in San Ramon?
>
> A.   No.
>
> Q.   Okay. Why not?
>
> A.   We had sold that house.
>
> Q.   When did you sell that house, do you remember?
>
> A.   To the best of my recollection, October of 2018.
>
> Q.   Okay. So why did you tell Adam [the DFM representative] that you had an interest rate and a loan on that Satin Leaf property?
>
> A.   Because I was going to report this call as an illegal auto dial robocall.
>
> Q.   Okay. And did you need to continue the call with him? Wasn't him just calling you making it illegal that he called you?
>
> A.   I wanted to get all of the information. I had already told them not to call me on the 21st.
>
> Q.   So what information did you need from Adam that would cause you to tell him that you had a loan on Satin Leaf Way and that you had a 5.5 percent interest rate? What information were you looking for from him?
>
> A.   I wanted to find out who was the mortgage company.

Schick Depo. at 99:1-22; Schick Depo., Ex. 10[5] at 3:6-9. Knowing what to say to induce DFM's representative to transfer the call to a lender, Schick lied about wanting to update the house and wanting $25,000 to $50,000 cash out:

> BY MR. ABBOTT:
>
> Q.   All right. Ms. Schick, you were -- you're continuing on and saying that you want to do some updating. Is that -- is that -- are you doing that to keep the call going to find out who this person is going to transfer the call to?
>
> A.   Yes.
>
> Q.   Okay. So are you familiar with -- you're expecting at this point in the call that, based on what you tell Adam, that he

---

[5] A copy of the certified transcript of the audio recording attached as Exhibit 10 to the Schick Deposition is attached as Exhibit C to the Abbott Declaration.

CALIBER HOME LOANS, INC.'S MOTION FOR SUMMARY JUDGMENT

1                                  may transfer the call to a lender?

2        A.       Yes.

…

3        Q.       Okay. I'm pausing the record again, Ms. Schick. You're kind

4                     of going further and you're getting into detail about updating, and you're telling this operator, Adam, that you're estimating

5                     it's going to be 25- to \$50,000. Did I hear that? Is that what you heard too?

6        A.       Yes.

7        Q.       So this sounds to me like it's somewhat prepared, some of the things you're saying. Was this -- is this something that you

8                     had a rough outline of what to say to get the call to a point where it was transferred to a lender?

9        A.       No. But I know that if I talk with him, it would keep the call going, and he hopefully would transfer me.

10

Schick Depo. at 101:17-102:24; Abbott Decl., Ex. C at 3:6-6:17. Schick continued by disclosing

11

private information about her finances:

12               ADAM KINSELLA:  Okay. And do you know how your credit is

13               right now? Like excellent?

14               DEBORAH SCHICK: Yeah, our credit is really good.

15               ADAM KINSELLA:  Like above 700? Above 800?

                     DEBORAH SCHICK: I would assume it's above 700.

16               ADAM KINSELLA:  Okay, because our elite pricing starts at 740, so if you're above that --

17               DEBORAH SCHICK: I think we are.

18              …

19               ADAM KINSELLA:  Okay. And I'm assuming since you have great credit, you haven't been late on any of the payments, no foreclosures or bankruptcies, anything like that?

20               DEBORAH SCHICK: No, none of that.

21

Abbott Decl., Ex. C at 3:10-5:8. In fact, Schick no longer had a loan or owned the property she was

22

feigning interest in refinancing. Schick Depo. at 99:1-7.

23

      After Schick lied about still owning the property and shared her private information to

24

convince Adam she was interested in a refinance loan, Adam called Caliber to transfer Schick as a

25

warm transfer lead. Schick Depo. at 114:15-19; Abbott Decl., Ex. A at p. 4 (Schick response to

26

Interrogatory No. 7). Zain Subhani at Caliber answered the call, and Adam summarized the facts

27

28

CALIBER HOME LOANS, INC.'S MOTION FOR SUMMARY JUDGMENT

Schick conveyed to Adam. Schick Depo. at 119:14-24; Abbott Decl., Ex. D at 2:14-23[6]. Schick then continued to feign interest by referring to the same property and confirmed that Adam's introduction was accurate. Schick Depo. at 119:14-24, 122:2-12; Schick Depo, Ex. 11 at 3:4-4:9. Schick admits that the ultimate goal of this ruse was to get "an e-mail from Zain" to prove she was called. Schick Depo. at 122:13-18.

## C.     Caliber Learned of Schick's Allegations and Terminated Its Purchase of Leads from NLD When NLD Failed to Provide Evidence That It Sold TCPA-Compliant Leads to Caliber

Caliber had no affiliation with DFM and no knowledge of DFM's involvement before learning of Schick's allegations. Kopil Decl. ¶¶ 5-6; Abbott Decl., Ex. B at pp. 3-6, 10 (DFM responses to Interrogatory Nos. 4, 10-12, 18-20 and DFM response to Request for Admission No. 2); *see also* Borneman Decl. ¶¶ 6-7. Schick admits that she cannot prove otherwise. Schick Depo. 142:5-21, 144:25-146:2. To the contrary, the evidence shows that, despite NLD's contract requiring it to notify Caliber and obtain approval before using any subcontractor, NLD never notified Caliber of its agreement with DFM for DFM to provide leads to Caliber. Kopil Decl. ¶¶ 22-23; Borneman Decl. ¶¶ 6-7; *see* Abbott Decl., Ex. B at p. 4 (DFM response to Interrogatory No. 12). Consequently, in discovery, DFM testified that Caliber never exerted any control over DFM, never had any authority over DFM, never controlled DFM's day-to-day activities, and never instructed DFM about what numbers to call. Abbott Decl., Ex. B at pp. 10-11 (DFM responses to Request for Admission Nos. 3-6, 8, 11); *see* Borneman Decl. ¶ 8.

Caliber was completely in the dark about the existence of DFM until December 2019, when Caliber learned of an alleged violation of the TCPA resulting from the call Adam Kinsella transferred to Caliber on Schick's behalf. Kopil Decl. ¶ 27. As a result of that allegation, Caliber asked NLD to confirm its compliance with the TCPA for that lead. *Id.* When NLD could not provide such confirmation, Caliber immediately ceased purchasing leads from NLD. *Id.*; Borneman Decl. ¶ 11.

---

[6] A copy of the certified transcript of the audio recording attached as Exhibit 11 to the Schick Deposition is attached as Exhibit D to the Abbott Declaration.

## III.    LEGAL STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the material facts before the Court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is therefore appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Lowry v. City of San Diego*, 858 F.3d 1248, 1255 (9th Cir. 2017). A party may seek summary judgment regarding all or any part of a claim. Fed. R. Civ. P. 56(a).

The moving party has the initial burden to prove that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Once the moving party has carried this initial burden, the burden shifts to the opposing party to establish that a genuine issue of material fact actually exists. *Id*. The party opposing summary judgment must go beyond the pleadings to designate specific facts establishing a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must present evidence sufficient for a jury to render a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The opposing party therefore "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. It must present significant probative evidence tending to support its claim or defense. *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *accord United States v. $133,420 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) ("[A] conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact[.]" (internal quotation marks omitted)). Bare allegations, speculation, or conclusory language will not meet this burden; nor will inadmissible evidence or only a "scintilla" of evidence. *See Jones v. Williams*, 791 F.3d 1023, 1032 (9th Cir. 2015); *Angle v. Miller*, 673 F.3d 1122, 1134 & n.6 (9th Cir. 2012); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Failure of proof as to any essential element of a party's claims means that no genuine issue of material fact can exist and summary judgment should be entered for the party defending against those claims. *See Celotex*, 477 U.S. at 322; *Trunk v. City of San Diego*, 660 F.3d 1091, 1098 (9th Cir. 2011), *cert. denied*, 567 U.S. 944 (2012).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IV.    LEGAL ARGUMENT

**A.    Summary Judgment Should Be Granted Because the Record Shows That Caliber Was Involved In Only One Call**

Under the TCPA, a private right of action for calling a person listed on the national Do Not Call registry exists only if the plaintiff "received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection…" 47 U.S.C. § 227(c)(5). The record shows that only one call involved Caliber so Schick is not authorized to initiate a private right of action against Caliber.

Schick received two phone calls from DFM, on November 21 and 26, 2019. FAC ¶¶ 40-41, 47, 49; Schick Depo. at 140:6-9 (testifying that DFM initiated the phone calls); Kopil Decl. ¶¶ 3-4 (Caliber placed neither call). The first call, on November 21st, lasted seven seconds and ended almost immediately. Abbott Decl., Ex. H. There was no discussion between DFM and Schick and no mention of Caliber. *Id.* Caliber never joined the call. *Id.* The second call, on November 26th, was transferred to Caliber.

There is no evidentiary basis to attribute to Caliber the first call that DFM placed to Schick. DFM did not transfer all of its calls to Caliber, only those that qualified. *See* Gabster Decl. ¶ 4 (describing criteria for warm transfer leads), ¶ 11 (explaining that if a lead did not meet Caliber's criteria for purchasing leads it would be transferred to a different lender); Kopil Decl. ¶¶ 20-21 (explaining that Caliber's involvement with a lead began only after a call transferred and Caliber understood that NLD could transfer a lead to any of its customers, at NLD's sole discretion). Calls that did not qualify were transferred to other mortgage originators or were not transferred at all. *Id.* Caliber did not provide any telephone data to NLD (or DFM) or otherwise direct either entity to place a call to Schick. Gabster Decl. ¶ 5 (describing how DFM obtained Schick's number through a purchase of a data file from "Boss Leads"); Abbott Decl., Ex. B at 5 (DFM response to Interrogatory No. 17). In sum, Caliber had nothing whatsoever to do with the first call by DFM to Schick.

Accordingly, even if Caliber were liable for the second call (it is not), it is undisputed that Caliber had zero involvement in the first call. Since the TCPA authorizes causes of action only for

multiple calls placed to individuals who are listed on the national Do Not Call registry, and at most a single call is at issue here, Schick's claim under 47 U.S.C. § 227(c) fails as a matter of law.

**B.     Summary Judgment Should Be Granted Because Schick Lacks Standing**

    **1.     Schick Lacks Article III Standing**

"The jurisdiction of federal courts is defined and limited by Article III of the Constitution." *Flast v. Cohen*, 392 U.S. 83, 94 (1968). "[T]he most important of Article III's jurisdictional requirements is that plaintiffs have standing to bring their case to federal court." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 690–91 (9th Cir. 2021) (Bumatay, C.J., dissenting); *accord*: *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("standing is perhaps the most important of the jurisdictional doctrines").

To establish Article III standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent ["concreteness"]; (ii) that the injury was likely caused by the defendant ["traceability"]; and (iii) that the injury would likely be redressed by judicial relief ["redressability"]." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). If the plaintiff cannot establish "an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (citing *Casillas v. Madison Avenue Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019) (Barrett, J.)).

Here, Schick's alleged injury is neither traceable to Caliber nor concrete.

    **a.     Schick's Purported Injury is Not Traceable to Caliber**

Schick's purported TCPA injury on the first call is not traceable to Caliber because she terminated the call before DFM could determine whether she met the criteria for a lead. The recording of the November 21, 2019 call produced in discovery by DFM shows a brief call with no mention of Caliber:

> DEBORAH SCHICK:          Hello?
> UNIDENTIFIED SPEAKER:Hello, Sidney? Hello?
> (End of recording.)

Abbott Decl., Ex. H at 2:1-3. DFM provides leads to multiple entities, not just Caliber. *See* Gabster

- 9 -

Decl. ¶ 11 (explaining that DFM would route leads to other lenders if Caliber's criteria were not met). And nothing in the record establishes that this call on November 21st would have led to a call by DFM to Caliber. *Id.*; *see also* Kopil Decl. ¶¶ 20-21 (Caliber's involvement in a call began only after it received a transfer and Caliber understood that NLD could sell a lead to any NLD customer at NLD's sole discretion). Thus, to the extent that Schick suffered any injury with respect to this call, *see e.g., Grigorian v. FCA US LLC*, 2020 WL 7238392 (11th Cir. Dec. 9, 2020) (dismissing for lack of standing TCPA claim premised on single text), Schick's injury is not fairly traceable to Caliber.

Schick's purported TCPA injury on the second call is not traceable to Caliber either because it is entirely self-inflicted. Schick, who is a serial TCPA plaintiff, received a call not from Caliber, but from DFM, who asked if she was interested in refinancing her home loan. Abbott Decl., Ex. C at 3:6-9; Schick Depo. at 119:14-24. Perhaps recognizing that she would be transferred to an additional party if she answered that she was interested, Schick concocted a story about her mortgage finances using a property she no longer owned. Schick Depo. at 98:11-99:22. She told Adam from DFM that it would be good if she could lower her interest rate from 5.5% to 4%. Abbott Decl., Ex. C at 3:6-9. She disclosed private (false) financial information regarding whether she had other loans, the equity in the property, and her credit rating. Abbott Decl., Ex. C at 3:23-5:8; Schick Depo. at 98:11-21, 162:10-24. And she even conveyed a story about wanting to do some "updating" on the property that would cost between $25,000 and $50,000 to round out the ruse. Abbott Decl., Ex. C at 6:11-17; Schick Depo. at 101:20-102:1. All of these details were lies because Schick did not own the property in question. Schick Depo. at 99:1-22. Schick prolonged the call to collect information for her claim: she asked for Adam's callback number, she confirmed the number dialed to initiate the call, and she understood that disclosing details would encourage Adam to call a lender on her behalf. Schick Depo. at 98-99, 162:10-24, 186:21-187:5, 218:22-219:1, 219:25-220:3. Had she not pretended to be interested in refinancing and concocted a story about the ideal refinancing candidate, the call would never have been transferred to Caliber. *See* Gabster Decl. ¶ 4 (describing criteria for warm transfer leads), ¶ 11 (explaining that if a lead did not meet Caliber's criteria for purchasing leads it would be transferred to a different lender).

After DFM called Caliber on Schick's behalf based on Schick representing that she was interested in speaking to a lender about refinancing her home, Schick repeated the ruse with Zain Subhani at Caliber. She confirmed with Caliber that she was looking to refinance her home and agreed with the false information she had provided DFM. Schick Depo. at 119:14-24, 122:2-12; Abbott Decl., Ex. D at 2:14-23, 3:4-4:9. Schick went so far as to provide details about her property that she knew Zain could confirm online with the hope that he would continue the call. Schick Depo. at 127:20-128:10, 128:15-129:6. Schick testified that she provided more information to Zain at Caliber than she provided to Adam at DFM because she wanted to convince Zain to provide an e-mail address and phone number that she could use to support a future lawsuit. *Id.* at 132:3-19. Schick had already created a special e-mail address to give to her TCPA targets, like Zain, and this is the email address she gave him. *See id.* at 133:3-7 ("Q: All right. And is this an e-mail that you created for the purpose of receiving these types of e-mails from calls like this?" … "A. Yes.") Schick also asked Zain for his number. *Id.* at 134:4-17.

A self-inflicted injury that breaks the causal chain is not fairly traceable to the defendant. *Mendia v. Garcia*, 768 F.3d 1009, 1013 n. 1 (9th Cir. 2014) (explaining that immigration detainee lacked standing to seek damages for a portion of his pre-trial detention because "the loss of liberty he experienced after being granted release on his own recognizance is .... a self-inflicted injury"); *Eliahu v. Israel*, No. 14-CV-01636-BLF, 2015 WL 981517, at *8 (N.D. Cal. Mar. 3, 2015) ("A plaintiff cannot sustain Article III standing based on injuries that are self-inflicted."); *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 866 (6th Cir. 2020) (same); *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) ("self-inflicted" injury insufficient to confer Article III standing); *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 888 (10th Cir. 2021) (same). Here, because DFM called Schick, not Caliber, and Schick's call never would have been transferred by DFM to Caliber had Schick not fabricated a story about wanting to refinance her home, any purported injury relating to the Caliber call is entirely self-inflicted. Schick therefore cannot trace her injury to Caliber and lacks standing to pursue a claim against Caliber in federal court. *See also Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("[A] plaintiff may not establish injury for standing purposes based on a 'self-inflicted'

injury.'"); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (A plaintiff's "self-inflicted injuries are not fairly traceable" to the defendant and, "does not give rise to standing.").

### b. Schick's Purported Injury is Not Concrete

Schick also lacks Article III standing because the record does not support that she suffered any concrete injury. Schick received two calls. The first one was seven seconds long (and did not involve Caliber, as explained above). Abbott Decl., Ex. H. The second call would have been similarly short had Schick not purposefully prolonged it. Schick Depo. at 99:1-22, 101:20-102:5. Neither call resulted in monetary injury because the phone was on an unlimited data plan with no minutes. Naiman Depo. at 10:20-11:19. And Schick cannot credibly claim a privacy injury based, in the case of the first call, on a two-second call or, in the case of the second call, on a call she purposefully prolonged to substantiate a TCPA claim. As a result, neither call gives rise to the type of concrete injury sufficient to confer Article III jurisdiction over Schick's claim. *See e.g., Grigorian v. FCA US LLC*, 2020 WL 7238392 (11th Cir. Dec. 9, 2020) (finding that a recipient of a single prerecorded voicemail message on her cell phone did not allege a concrete injury and did not have standing to sue under the TCPA).

In the second call, Schick cannot show a concrete injury for the additional reason that she waived an expectation of privacy when she volunteered private information in her attempt to prolong the call to reach a mortgage lender. Schick Depo. at 127:6-15 (testifying that Schick provided her credit score to convince DFM to transfer the call to Caliber); Abbott Decl., Ex. C at 4:19-5:1 (telling Adam her credit score is above 740), 5:4-8 (telling Adam there are no late payments, foreclosures or bankruptcies), 5:16-6:3 (telling Adam about her income situation and having to pay taxes). To determine whether an injury is sufficiently concrete, courts must look to the "history and tradition [as] a meaningful guide to the types of cases that Article III empowers federal courts to consider." *TransUnion LLC*, 141 S. Ct. at 2204. "Importantly, this Court has rejected the proposition that 'a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Id.* at 2205 (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).

Here, Schick asserts that the purported TCPA violation was an invasion of her privacy. FAC ¶ 58. The statutory text also establishes that the TCPA is designed to protect against the type of harm traditionally recognized as invasion of privacy. 47 U.S.C. § 227(c); *see also Mey v. Got Warranty, Inc.*, 193 F. Supp. 3d 641, 645 (N.D.W. Va. 2016) ("The invasion of privacy claim that is most analogous [to the TCPA] is intrusion upon seclusion.") (citing Restatement (Second) of Torts § 652B (1977)). However, by offering private information regarding her credit score, foreclosure and bankruptcy history, and tax situation, Schick consented to the consequence of the additional purported invasion of privacy resulting from Adam calling Caliber on her behalf. *Sanchez-Scott v. Alza Pharms.*, 86 Cal. App. 4th 365, 376 (2001) ("The maxim of law that one 'who consents to an act is not wronged by it' applies to the tort of invasion of privacy."). The law is clear that "the plaintiff in an invasion of privacy case must have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e., he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions of defendant." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 26 (1994). Here, Schick did consent to the purported invasion of privacy occasioned by the transfer of the call to Caliber, and therefore, she did not have a reasonable expectation of privacy and cannot establish a concrete injury by the November 26th call.

Because Schick's purported injuries are neither fairly traceable to Caliber nor concrete, she lacks Article III standing. The Court should grant summary judgment in favor of Caliber and dismiss the case for lack of jurisdiction. *Garcia*, 2020 WL 4431679, at *3 (granting summary judgment in favor of TCPA defendant because plaintiff failed to take steps necessary to stop the unwanted calls and because plaintiff took steps to allow the unwanted calls to continue); *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782, 803 (W.D. Pa. June 24, 2016) (granting summary judgment in favor of defendant on Article III grounds because plaintiff filed TCPA actions as part of a scheme to generate revenue).

### 2. Schick Lacks Prudential Standing Because She is Not Within the TCPA's Zone of Interests

Assuming *arguendo* that Schick had suffered an injury-in-fact, summary judgment in Caliber's favor is still proper because Schick lacks prudential standing.

Prudential standing requires a plaintiff's injury to "fall within 'the zone of interest to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U. S. 150, 153 (1970)). "A court must therefore 'determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.'" *Garcia*, 2020 WL 4431679, at *3 (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014)).

"In enacting the TCPA, Congress found that banning robocalls was 'the only effective means of protecting telephone consumers from' the nuisance and privacy invasion that they caused." *Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2344 (2020) (citing TCPA § 2, ¶12, 105 Stat. 2394). As discussed above, the record shows that Schick was not concerned about her privacy interest. *See supra*, Section IV.A.1.b. Instead, Schick's sole concern was her economic interest — to deceive Adam into believing that she was interested in a refinance loan so Adam would call a mortgage company and present Schick as a warm transfer lead. *Id.* Schick went so far as to disclose her credit rating and other private information. *Id*. Schick's conduct is similar to that of the plaintiffs in *Garcia v. Credit One Bank, N.A.*, 2020 WL 4431679 and *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782. In *Garcia*, the court found that the plaintiff "took steps to allow the continuance of the injury while building a record to facilitate a later claim." *Garcia*, 2020 WL 4431679, at *3. And the court in *Stoops* found that the plaintiff "file[d] TCPA actions as a business." *Stoops*, 197 F. Supp. 3d 782 at 798. In both cases, the court concluded that the plaintiff's interests were "so marginally related to or inconsistent with the purposes implicit in the [TCPA] that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 805; *Garcia*, 2020 WL 4431679, at *3 (quoting *Stoops*, 197 F. Supp. 3d at 805). Like *Garcia* and *Stoops*, Schick actively prolonged the call from Adam so he would call a lender on her behalf. This is not an interest that Congress intended to protect when it enacted the TCPA. Accordingly, Schick lacks prudential standing.

1
2

**C.     Summary Judgment Should Be Granted Because Caliber Did Not Initiate Either Call and is Not Vicariously Liable for DFM's Actions**

3

Under the TCPA "[t]here are two potential theories of liability: (1) direct liability; and (2)

4

vicarious liability." *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014). The

5

undisputed record shows that Caliber is not directly liable because it did not make or initiate any

6

call to Schick. The record further shows that Caliber is not vicariously liable for the calls to Schick

7

because Caliber did not know of DFM's involvement in providing leads to Caliber until this lawsuit

8

was filed. Without knowing of DFM, or that it called Schick, Caliber could not authorize or ratify

9

the call, or exercise sufficient control over DFM, to render it vicariously liable for DFM's actions.

10

Therefore, the Court should grant summary judgment in favor of Caliber and against Schick.

11

**1.     Caliber is Not Directly Liable for DFM's Calls Because Caliber Did Not Make Or Initiate a Call to Schick**

12

The plain language of the TCPA assigns civil liability to the party who "makes" or

13

"initiates" a call. 47 U.S.C. § 227(b)(1)(A)-(B). A party is therefore "not directly liable for a

14

violation of the TCPA unless it initiates a call…" *In re Joint Petition Filed by Dish Network, LLC*,

15

28 F.C.C. Rcd. 6574, 6582 (2013) ("*Dish Network*"); *Thomas*, 582 F. App'x at 679 (direct liability

16

inapplicable against party who did not make or initiate text message); *see also Naiman v. TranzVia*

17

*LLC*, No. 17-CV-4813-PJH, 2017 WL 5992123, at *1 (N.D. Cal. Dec. 4, 2017) (citing statute);

18

*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*, No. 18-CV-07311-VC, 2019 WL

19

6907077, at *1 (N.D. Cal. Dec. 19, 2019) (defendant who did not make the call "did not directly

20

violate the TCPA.").

21

The TCPA and its implementing regulations do not define the terms "make" or "initiate."

22

*Meeks v. Buffalo Wild Wings, Inc.*, No. 17-CV-07129-YGR, 2018 WL 1524067, at *4 (N.D. Cal.

23

Mar. 28, 2018); *Dish Network*, 28 F.C.C. Rcd. at 6583. However, the FCC has concluded that "a

24

person or entity 'initiates' a telephone call when it takes the steps necessary to physically place a

25

telephone call..." *Adzhikosyan v. Callfire, Inc.*, No. CV 19-246 PSG (GJSX), 2019 WL 7856759,

26

at *2 (C.D. Cal. Nov. 20, 2019) (quoting *Dish Network* at 6583). The term "does not include persons

27

or entities, such as third-party retailers, that might merely have some role, however minor, in the

28

CALIBER HOME LOANS, INC.'S MOTION FOR SUMMARY JUDGMENT

1    causal chain that results in the making of a telephone call." *Id.* "In other words, to 'initiate' suggests

2    some 'direct connection between a person or entity and the making of a call.'" *Id.* (quoting *Dish*

3    *Network* at 6583); *Sheski v. Shopify (USA) Inc.*, No. 19-CV-06858-HSG, 2020 WL 2474421, at *2

4    (N.D. Cal. May 13, 2020) (applying the same analysis to the term "make a call").

5    Caliber did not make or initiate either call alleged in the FAC. Caliber took no steps to

6    physically place a telephone call to Schick. Kopil Decl. ¶¶ 3-4; Schick Depo. at 140:6-9 (testifying

7    that DFM initiated the phone calls). Rather, it was DFM that selected the phone number and placed

8    the phone calls to Schick. Gabster Decl. ¶ 5; Abbott Decl., Ex. B at p. 5 (DFM response to

9    Interrogatory No. 17). It was a DFM representative who spoke to Schick after she answered the

10   calls. FAC ¶¶ 40-41, 47, 49; Schick Depo. at 140:6-9 (testifying that DFM initiated the phone calls);

11   Kopil Decl. ¶¶ 3-4 (Caliber placed neither call). And it was a DFM representative who transferred

12   a single call to Caliber after Schick deceived him into believing she wished to speak with a loan

13   originator. Schick Depo. at 82:14-18, 101:17-102:24, 110:3-7. Caliber took no part in any of these

14   steps. And while Caliber purchased live transfer leads from NLD, it did not provide NLD—let

15   alone DFM—with any telephone numbers to call and certainly did not cause NLD or DFM to call

16   any phone numbers. Kopil Decl. ¶ 19; Abbott Decl., Ex. B at 5 (DFM response to Interrogatory

17   17); Gabster Decl. ¶ 5.

18   It is not enough for purposes of direct TCPA liability to establish that Caliber contracted

19   with NLD for leads. *Adzhikosyan*, 2019 WL 7856759, at *2 (C.D. Cal. Nov. 20, 2019) (excluding

20   form the definition of "initiate" entities "that might merely have some role, however minor, in the

21   causal chain that results in the making of a telephone call"). Caliber had no control or knowledge

22   regarding how NLD obtained the leads. *Id.* ¶ 20. In fact, Caliber knew "very little" about how NLD

23   obtained leads because NLD used a "proprietary model." Kopil Depo. at 19:15-18, 59:4-11

24   (explaining that NLD referred to their process as proprietary in the SOW), 69:17-24, 106:15-22.

25   All it knew was that NLD's leads were supposed to be "TCPA compliant" and were supposed to

26   come from NLD itself. Kopil Decl. ¶ 14, Ex. B at p. 1 & Ex. A § 2(b); Borneman Decl., Ex. 1 § 2(b)

27   & Ex. 2 at p. 1.

28   Finally, contrary to taking steps necessary to physically place a telephone call or being

- 16 -

1   directly connected with the making of the call, Caliber's involvement in any particular call began

2   only *after* the call in question was transferred to Caliber. Kopil Decl. ¶ 20. Indeed, NLD had other

3   customers besides Caliber and any lead obtained by NLD could have just as easily been transferred

4   to any other NLD customer, at NLD's sole discretion. *Id*. ¶ 21; Gabster Decl. ¶ 11 (explaining that

5   if a lead did not meet Caliber's requirements to purchase a lead, DFM would send the lead to

6   another lender).

7         Accordingly, there is no material disputed fact that Caliber did not make or initiate any call

8   to Schick and is therefore not directly liable for any alleged TCPA violation.

9         **2.**     **Caliber is Not Vicariously Liable to Schick for Calls Made by DFM Because**
             **There is No Agency Relationship Between Caliber and DFM**

10         The "Federal Communications Commission has ruled that, under federal common-law

11   principles of agency, there is vicarious liability for TCPA violations." *Campbell-Ewald Co. v.*

12   *Gomez*, 577 U.S. 153, 168 (2016) (citing *Dish Network*). To establish an agency relationship

13   between Caliber and DFM, Schick must establish actual authority, apparent authority, ratification,

14   or employment (respondeat superior). *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 448–49

15   (9th Cir. 2018) (describing the "bedrock theories of agency" under federal common-law principles).

16   The undisputed material facts show that Schick cannot establish any of the forgoing.

17         **a.**     **DFM Did Not Have Actual Authority to Place Calls On Caliber's**

18                **Behalf**

19         "Actual authority is limited to actions specifically mentioned to be done in a written or oral

20   communication or consistent with a principal's general statement of what the agent is supposed to

21   do." *Jones*, 887 F.3d at 449 (quoting *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939 (9th Cir.

22   2017)). Actual authority does not exist where the principal prohibits the act or omission for which

23   the agent is accused. *Id.* ("But to reverse summary judgment as to actual authority, Jones and

24   Watson must do more than establish an agency relationship. They must also establish actual

25   authority to place the unlawful calls.")

26         Here, Caliber never directed DFM to place calls—to Schick or otherwise. To the contrary,

27   Caliber's contract with NLD prohibited the calls. Caliber had no affiliation with DFM and no

28   knowledge of DFM's involvement in providing Caliber leads until it learned of Schick's

- 17 -

1    allegations. Kopil Decl. ¶¶ 5-6; Abbott Decl., Ex. B at pp. 3-6, 10 (DFM responses to Interrogatory

2    Nos. 4, 10-12, 18-20 and DFM response to Request for Admission No. 2); *see also* Borneman Decl.

3    ¶¶ 6-7. NLD also promised not to use any third parties without first letting Caliber know. Kopil

4    Decl. ¶ 15, Ex. A § 2(b); Borneman Decl., Ex. 1 § 2(b). Caliber received no request or notice from

5    NLD regarding its use of DFM. Kopil Decl. ¶¶ 22-23; Borneman Decl. ¶¶ 6-7; *see* Abbott Decl.,

6    Ex. B at p. 4 (DFM response to Interrogatory No. 12). Caliber could not have authorized DFM to

7    place calls to Schick when Caliber did not know of, let alone authorize, DFM's involvement in the

8    first place.

9          In fact, Caliber prohibited the calls that gave rise to this action. Caliber's contract with NLD

10   required it to provide only "TCPA compliant data records." Kopil Decl. ¶ 14, Ex. B at p. 1;

11   Borneman Decl., Ex. 2 at p. 1. NLD also agreed to comply with "all applicable federal, state, and

12   local laws, regulations and ordinances." Kopil Decl. ¶ 13, Ex. A § 2(a)(i); Borneman Decl., Ex. 1

13   § 2(a)(i). Caliber relied on NLD's promises when it decided to purchase live transfer leads from

14   NLD. Kopil Decl. ¶ 16. Caliber would not have purchased any live transfer leads from NLD if NLD

15   had not promised that its leads were compliant with the TCPA and DNC. *Id.* ¶ 17.

16         Since Caliber did not know of DFM's involvement and relied on NLD's promises that its

17   leads would comply with applicable law, including the TCPA and DNC, Caliber did not authorize

18   DFM to place unlawful calls to Schick.

19              **b.      DFM Did Not Have Apparent Authority from Caliber**

20         Although she alleges no supporting facts, Schick's complaint recites a portion of the FCC

21   ruling in *Dish Network* that discusses apparent authority as a basis for vicarious liability under the

22   TCPA. FAC ¶ 73. "[A]pparent authority exists when the principal's own actions lead the plaintiff

23   to reasonably believe that the agent has authority to perform certain acts for the principal." *Abante

24   Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*, No. 18-CV-07311-VC, 2019 WL 6907077, at *1

25   (N.D. Cal. Dec. 19, 2019) (citing *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045,

26   1055 (9th Cir. 2017)). In *Dish Network*, the FCC provided guidance on examples of evidence that

27   may demonstrate apparent authority to support vicarious liability under the TCPA:

28              apparent  authority  may  be  supported  by  evidence  that  the  seller

                                          - 18 -

1

2

3

4

5

> allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts.

6   *Dish Network*, 28 F.C.C. Rcd. at 6592 ¶ 46.

7       Here, none of Caliber's own actions would have reasonably led Schick to believe that DFM

8   was acting as Caliber's agent. In fact, Caliber had no control over any of NLD's services or over

9   DFM. Kopil Decl. ¶ 18; Borneman Decl. ¶ 8 ("Caliber never … directed the manner or means of

10  telephone calls made by Driving Force Media"); Abbott Decl., Ex. B at pp. 3-6, 10 (DFM responses

11  to Interrogatory Nos. 4, 10-12, 18-20 and DFM response to Request for Admission No. 2). Caliber

12  did not provide NLD or DFM with any telephone data and did not cause NLD or DFM to call any

13  phone numbers. Kopil Decl. ¶ 19; Gabster Decl. ¶ 5 (describing the acquisition of Schick's number

14  through DFM's purchase of a data file from "Boss Leads"). Caliber's involvement in any particular

15  call began only *after* the call in question was transferred to Caliber. Kopil Decl. ¶ 20. Caliber did

16  not have any control or knowledge regarding how NLD obtained the leads. *Id*. Caliber understood

17  that NLD had other customers besides Caliber and any lead obtained by NLD could have been

18  transferred to any other NLD customer, at NLD's sole discretion. *Id*. ¶ 21.

19      Additionally, there is no evidence that DFM had the type of access identified by the FCC

20  as required for apparent authority. To the contrary, the evidence shows that Caliber did not know

21  of DFM and DFM had no communications or interactions with Caliber. Kopil Decl. ¶¶ 5-6; Abbott

22  Decl., Ex. B at pp. 3-6, 10 (DFM responses to Interrogatory Nos. 4, 10-12, 18-20 and DFM response

23  to Request for Admission No. 2); *see also* Borneman Decl. ¶¶ 6-7. As such, there is no fact that

24  falls within the examples provided by the FCC in *Dish Network*. It is therefore unsurprising that

25  courts generally do not find apparent authority under circumstances like these. *See Kristensen v.*

26  *Credit Payment Servs. Inc.*, No. 2:12-CV-00528-APG, 2015 WL 4477425, at *5-6 (D. Nev. July

27  20, 2015) (mere purchase of live transfer lead without more does not support apparent authority);

28  *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 577, 588 (S.D. Ohio 2016) ("action taken for the

benefit of a seller by a third-party retailer, without more, is insufficient to trigger the liability of a seller under [the Do Not Call provision of the TCPA].”); *see also In re: Monitronics Int'l, Inc., Tel. Consumer Prot. Act Litig.*, 223 F. Supp. 3d 514, 525 (N.D.W. Va. 2016) (authorized dealer's violation of the TCPA not a basis for vicarious liability of manufacturer absent an agency relationship).

Finally, the fact that the call on November 26, 2019 was transferred to Caliber does not support apparent authority either. This fact might lead one to reasonably conclude that DFM possessed authority to procure leads for Caliber's financial services. But Plaintiff cannot establish apparent authority through evidence of DFM's actions alone; she must point to action taken *by Caliber* to reasonable lead her to that conclusion. *See Abante Rooter & Plumbing, Inc.*, 2019 WL 6907077, at *1 (“TX transferred the call to one of Arashi's employees, who further discussed the potential loan with Heidarpour. . . .This conversation certainly could lead one to reasonably conclude (correctly) that DTX possessed the authority to procure leads for Arashi's financing services. But Arashi did nothing to give Abante the (incorrect) impression that Arashi, by purchasing leads, had authorized DTX to use an ATDS or to call merchants on the Do-Not-Call Registry.) Here, there is no such evidence. Caliber did nothing to give Schick the impression that Caliber, by purchasing leads from NLD, had authorized DFM to call phone numbers in a manner that violated the TCPA. Accordingly, the evidence establishes that DFM did not have apparent authority to act on behalf of Caliber..

### c.    Caliber Did Not Ratify DFM's Unlawful Calls

Ratification is “the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.” *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) (quoting Restatement (Third) of Agency § 4.01(1)). The doctrine of ratification does not apply “when an actor is not an agent and does not purport to be one.” *Id.*; *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 680 (9th Cir. 2014) (“Although a principal is liable when it ratifies an originally unauthorized tort, the principal-agent relationship is still a requisite, and ratification can have no meaning without it.”) (quoting *Batzel v. Smith*, 333 F.3d 1018, 1036 (9th Cir. 2003) *superseded in part by statute on other grounds as stated in Breazeale v. Victim*

*Servs., Inc.*, 878 F.3d 759, 766–67 (9th Cir. 2017)). Further, even "if a principal ratifies an agent's act, the principal is not bound by ratification made without knowledge of material facts about the agent's acts unless the principal chose to ratify with awareness that such knowledge was lacking." *Kristensen* at 1014.

Here, Caliber did not and could not ratify any act by DFM because Caliber did not know that DFM was involved in NLD's generation of leads. Caliber received no request or notice from NLD regarding its use of DFM. Kopil Decl. ¶¶ 22-23; Borneman Decl. ¶¶ 6-7; *see* Abbott Decl., Ex. B at p. 4 (DFM response to Interrogatory No. 12). Caliber had no contract with DFM, did not communicate with DFM, and did not know about DFM's involvement until this lawsuit. *Kristensen*, 879 F.3d at 1014–15 (affirming summary judgment for defendant lenders where they had not contracted or communicated with lead publisher who sent unlawful text message to plaintiff). Thus there is neither an agency relationship with DFM, nor a ratification of DFM's actions. *See Thomas*, 582 F. App'x at 680 (requiring both to establish vicarious liability).

### d. Caliber Did Not Exercise Sufficient, Or Any, Control Over DFM for Liability Based On Respondeat Superior

"Vicarious liability stemming from control over 'manner and means' invokes the Restatement (Third) of Agency's theory of vicarious liability arising out of an employer-employee relationship." *Jones*, 887 F.3d at 450. "In determining whether vicarious liability may be imposed, the 'extent of control exercised by the [principal]' is the 'essential ingredient.'" *Id.* (quoting *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010)).

Here, there was no "employer-employee relationship," or any relationship whatsoever between Caliber and DFM. Kopil Decl. ¶¶ 5-6, 22-23; Abbott Decl., Ex. B at pp. 3-6, 10 (DFM responses to Interrogatory Nos. 4, 10-12, 18-20 and DFM response to Request for Admission No. 2); *see also* Borneman Decl. ¶¶ 6-8; Schick Depo. 142:5-21, 144:25-146:2 (testifying that she had no knowledge of any facts supporting a relationship or communication between Caliber and DFM). Under the MPSA, NLD promised not to allow any subcontractor or entity other than NLD to perform or provide the leads without prior written consent from Caliber. Kopil Decl., Ex. A § 2(b); Borneman Decl., Ex. 1 § 2(b). Caliber relied on NLD's promises and made the decision to purchase

live transfer leads from NLD. Kopil Decl. ¶ 16. Notwithstanding NLD's promises, Caliber received

no request or notice from NLD regarding its use of DFM. *Id.* ¶¶ 22-23; Borneman Decl. ¶¶ 6-7; *see*

Abbott Decl., Ex. B at p. 4 (DFM response to Interrogatory No. 12). Without knowledge of NLD's

use of DFM, Caliber could not have "controlled DFM through NLD" as Schick alleges and could

not have entered into an employer-employee relationship.

Moreover, even assuming *arguendo* that Caliber and DFM were in an employer-employee

relationship—which they were not—the record shows that Caliber did not exert the control over

DFM that would be necessary to support vicarious liability for DFM's calls to Schick. The Ninth

Circuit assesses ten-factors to determine whether a principal has enough authority to control the

actions of its agent such that the principal may be held vicariously liable:

> 1) the control exerted by the employer, 2) whether the one employed
> is engaged in a distinct occupation, 3) whether the work is normally
> done under the supervision of an employer, 4) the skill required, 5)
> whether the employer supplies tools and instrumentalities [and the
> place of work], 6) the length of time employed, 7) whether payment
> is by time or by the job, 8) whether the work is in the regular business
> of the employer, 9) the subjective intent of the parties, and 10)
> whether the employer is or is not in business.

*Jones* at 450. Here, none of these factors weigh in favor of an agency relationship and vicarious

liability.

*First*, the undisputed material facts show that Caliber exerted no control over DFM and did

not even know it existed. Kopil Decl. ¶¶ 5-6; Kopil Depo. at 19:15-18, 59:4-11 (explaining that

NLD referred to their piece as proprietary in the SOW), 69:17-24, 106:15-22; Abbott Decl., Ex. B

at pp. 3-6, 10 (DFM responses to Interrogatory Nos. 4, 10-12, 18-20 and DFM response to Request

for Admission No. 2); *see also* Borneman Decl. ¶¶ 6-7. DFM was engaged in a distinct

occupation—providing leads—whereas Caliber is a loan originator. Gabster Decl. ¶ 3; Borneman

Decl. ¶¶ 3-5; Kopil Decl. ¶ 2. *Second*, DFM is in a distinct occupation as compared to Caliber.

DFM generates leads; Caliber originates loans. Kopil Decl. ¶ 2. *Third*, though there is no evidence

regarding whether lead generation is typically done under the supervision of an employer, logic

dictates that this is not necessarily the case. And, here, Caliber did not supervise DFM. *Id.* ¶¶ 22-

23; Borneman Decl. ¶¶ 6-7; *see* Abbott Decl., Ex. B at pp. 4-6 (DFM responses to Interrogatory

Nos. 12-13, 18-20). Similarly, *fourth*, the Court can rely on common sense to determine that skill

required to generates leads is distinct form the skill required to originate home loans. *Fifth*, Caliber provided no tools or instrumentalities to DFM. *Id.* In fact, Caliber did not provide NLD or DFM with any telephone data and did not cause NLD or DFM to call any phone numbers. Kopil Decl. ¶¶ 6, 19; Abbott Decl., Ex. B (DFM response to Interrogatory No. 17); Gabster Decl. ¶ 5. *Sixth*, Caliber did not employ DFM. *Id. Seventh*, Caliber did not pay DFM. Caliber contracted with NLD, not DFM, to purchase leads and expressly sought to avoid using third parties without Caliber's prior written consent. Kopil Decl., Ex. A § 2(b), Ex. B at p. 1; Borneman Decl., Ex. 1 § 2(b), Ex. 2 at p. 1. *Eighth*, Caliber's regular business is loan origination and most of its new originations come from existing relationships, not leads. Kopil Decl. ¶ 2. *Ninth*, there is no evidence that the parties intended to enter into an employee-employer relationship. Caliber's involvement in any particular call began only after the call in question was transferred to Caliber. *Id.* ¶ 20. And, *tenth*, although Caliber is still in business this alone is clearly insufficient to find an employer-employee relationship.

Because there is no evidence under any factor establishing that DFM was Caliber's employee, Caliber cannot be vicariously liable for DFM's calls as DFM's employer.

Indeed, Caliber did not know whether the leads it received from NLD began by outbound calls from NLD or inbound calls to NLD:

> Q.   There was a result of an outbound call from NexLevel Direct that generated the lead for you, correct?
>
> A.   Can't answer that. You've shown me three different documents where there's a communication from Bill where he says they called me directly. There's a communication where he posts a website that they own that they likely filled out a form and clicked a box and then maybe they called them or maybe they -- I don't know.
>
> Q.   You didn't look into it?
>
> A.   I can't speak to how NexLevel got any of these people on the phone. It could have been any number of ways that -- we've looked at three or four even just today.

Kopil Depo. at 113:19-114:8. Caliber understood that NLD had other customers besides Caliber and any lead obtained by NLD could have been transferred to any other NLD customer, at NLD's sole discretion. Kopil Decl. ¶ 21.

*        *        *

- 23 -

A defendant who moves for summary judgment has no obligation to produce evidence that negates the plaintiff's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Instead, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. This "absence of evidence" can be established by showing that the plaintiff failed to provide information about her claim in discovery responses. *Id.* at 320 (plaintiff "failed to identify, in answering interrogatories specifically requesting such information, any witnesses who could testify about the decedent's exposure to petitioner's asbestos products."); *see also Cambridge Elecs. Corp. v. MGA Elecs.*, Inc., 227 F.R.D. 313, 321-325 (C.D. Cal. 2004); *see also tagTrends, Inc. v. Nordstrom, Inc.*, No. SACV1300563JVSJPRX, 2014 WL 12561604, at *4 (C.D. Cal. Sept. 30, 2014).

Here, as set forth above, there is no evidence to support any viable theory for imposing vicarious liability on Caliber for DFM's alleged TCPA violations. Schick's own evidence does nothing to alter this outcome. Her interrogatory responses provide no information relevant to this question. *See* Abbott Decl., Ex. B at pp. 4-6 (Schick responses to Interrogatories Nos. 7, 9-13). And, in deposition, Schick admitted she had no knowledge of facts supporting a relationship or communication between Caliber and DFM either. Schick Depo. 142:5-21, 144:25-146:2. Instead of providing evidence to support her claim, Schick merely defers to Caliber as the party with access to that information. Caliber's evidence shows, however, that it did not know of DFM's involvement, which was prohibited by contract, and that it relied on promises by NLD that it would only provide leads that complied with applicable law, including the TCPA. The Court therefore can, and should, conclude as a matter of law that Caliber is not vicariously liable for DFM's alleged TCPA violations.

## V.     CONCLUSION

Schick asserts a legal conclusion in her FAC that Caliber should be vicariously liable for DFM's calls to her in November 2019. When asked in discovery for information supporting her legal assumption of vicarious liability, Schick produced nothing. Caliber's evidence, however, shows it did not know of DFM; did not control DFM or NLD; was promised by NLD that its live transfer leads would comply with the TCPA and DNC; and that Caliber relied on that promise and

1  would not have agreed to buy leads from NLD otherwise. Caliber's evidence further shows that

2  NLD never told Caliber of DFM's involvement in NLD's generation of leads. Under these facts,

3  Caliber is neither directly or vicariously liable for the purported calls by DFM to Schick in

4  November 2019. The Court should grant summary judgment on the remaining claim for Caliber

5  and against Schick.

6  DATED: July 23, 2021                           **PERKINS COIE LLP**

7

8                                     By:  /s/ Thomas N. Abbott
                                            David T. Biderman, Bar No. 101577
9                                           DBiderman@perkinscoie.com
                                            Kristine E. Kruger, Bar No. 253593
10                                          KKruger@perkinscoie.com
                                            Thomas N. Abbott, Bar No. 245568
11                                          TAbbott@perkinscoie.com

12                                    Attorneys for Defendant
                                      Caliber Home Loans, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALIBER HOME LOANS, INC.'S MOTION FOR SUMMARY JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **PROOF OF SERVICE**

I, Matthew Walkup, declare:

I am a citizen of the United States and employed in San Francisco, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 505 Howard Street, Suite 1000, San Francisco, CA 94105-3204.

On July 23, 2021, I electronically filed the attached document:

DEFENDANT CALIBER HOME LOANS, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

with the Clerk of the court using the CM/ECF system which will then send a notification of such filing to the following:

| | |
|---|---|
| Edward A. Broderick<br>Broderick Law, P.C.<br>99 High Street, Suite 304<br>Boston, MA 02110<br>(617) 738-7080<br>(617) 830-0327 (fax)<br>ted@broderick-law.com | *Attorneys for Plaintiff*<br>Debora Schick |
| Jon Bernhard Fougner<br>600 California Street, 11th Floor<br>San Francisco, CA 94108<br>(415) 577-5829<br>(206) 338-0783 (fax)<br>Jon@FougnerLaw.com | *Attorneys for Plaintiff*<br>Debora Schick |
| Andrew Heidarpour<br>Heidarpour Law Firm, PLLC<br>1300 Pennsylvania Avenue NW, 190-318<br>Washington, DC 20004<br>(202) 234-2727<br>AHeidarpour@HLFirm.com | *Attorneys for Plaintiff*<br>Debora Schick |
| Matthew Passi McCue<br>The Law Office of Matthew P. McCue<br>1 South Avenue, Suite 3<br>Natick, MA 01760<br>(508) 655-1415<br>(508) 319-3077 (fax)<br>mmccue@massattorneys.net | *Attorneys for Plaintiff*<br>Debora Schick |

CALIBER HOME LOANS, INC.'S MOTION FOR SUMMARY JUDGMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Anthony I. Paronich                         *Attorneys for Plaintiff*
Paronich Law, P.C.                          Debora Schick
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(617) 485-0018
(617) 830-0327 (fax)
anthony@paronichlaw.com

Debbie Paulerio Kirkpatrick                 *Attorneys for Defendants*
Sessions Fishman Nathan & Israel, LLP       Driving Force Media and
1545 Hotel Circle South, Suite 150          Barry Gabster
San Diego, CA 92108
(619) 758-1891
(619) 296-2013 (fax)
dkirkpatrick@sessions.legal

Seth W. Wiener                              *Attorneys for Defendant*
Law Offices of Seth W. Wiener               NexLevel Direct LLC
609 Karina Court
San Ramon, CA 94582
(925) 487-5607
seth@sethwienerlaw.com

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 23, 2021, at Castro Valley, California.


*/s/ Matthew Walkup*
Matthew Walkup, Legal Practice Assistant

- 27 -

CALIBER HOME LOANS, INC.'S MOTION FOR SUMMARY JUDGMENT