1   David T. Biderman, Bar No. 101577
    DBiderman@perkinscoie.com
2   Kristine E. Kruger, Bar No. 253593
    KKruger@perkinscoie.com
3   Thomas N. Abbott, Bar No. 245568
    TAbbott@perkinscoie.com
4   PERKINS COIE LLP
    505 Howard Street, Suite 1000
5   San Francisco, CA 94105-3204
    Telephone: 415.344.7000
6   Facsimile: 415.344.7050

7   Attorneys for Defendant
    Caliber Home Loans, Inc.

8
                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                      SAN FRANCISCO DIVISION
11

12
    DEBORAH SCHICK, individually and on      Case No. 3:20-cv-00617-VC
13  behalf of all others similarly situated,
                                             CALIBER HOME LOANS, INC.'S REPLY IN
14                Plaintiff,                  SUPPORT OF ITS MOTION FOR
                                             SUMMARY JUDGMENT
15        v.
                                             Judge:            Hon. Vince Chhabria
16  CALIBER HOME LOANS, INC.,                Hearing Date:     September 2, 2021
    NEXLEVEL DIRECT LLC, DRIVING             Hearing Time:     2 p.m.
17  FORCE MEDIA, and BARRY GABSTER,          Hearing Location: Courtroom 4, 17th Floor
                                                               San Francisco Courthouse
18                Defendants.

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3   I.    INTRODUCTION .................................................................................................. 1

4   II.   ARGUMENT ........................................................................................................ 2

5         A.    Caliber is Entitled to Summary Judgment Because the Evidence Shows Caliber
                Was Involved in Only One Call ................................................................... 2

6               1.    The Evidence Shows DFM Did Not Discuss Any Criteria Necessary to
                      Transfer the Call on November 21, 2019, to Caliber .................................. 2

7               2.    Schick's Argument That NLD and DFM Were Telemarketing for Caliber
                      Ignores the Evidence .................................................................................. 5

8         B.    Caliber is Entitled to Summary Judgment Because Schick Lacks Standing ........... 6

9         C.    Caliber is Entitled to Summary Judgment Because Schick Fails to Establish an
                Agency Relationship Between Caliber and DFM ........................................... 9

10              1.    Schick Offers No Evidence to Show That Caliber Ratified DFM's
                      Purported Violations of the TCPA and Schick's Interpretation of *Dish
11                    Network* is Wrong ...................................................................................... 9

12              2.    The Ninth Circuit Opinion in *Henderson* Does Not Support the Finding of
                      Ratification Either ...................................................................................... 11

13  III.  CONCLUSION ................................................................................................... 14

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALIBER HOME LOANS, INC.'S REPLY ISO MOTION FOR SUMMARY JUDGMENT

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

4

C<small>ASES</small>

5

*1-800 Contacts, Inc. v. Lens.com, Inc.*,
  722 F.3d 1229 (10th Cir. 2013) .................................................................................. 3, 4

6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................................ 5

7

8

*Barr v. Am. Ass'n of Pol. Consultants, Inc*,
  140 S. Ct. 2335 (2020) .................................................................................................... 8

9

10

*FTC v. Lifewatch Inc.*,
  176 F. Supp. 3d 757 (N.D. Ill. 2016) ......................................................................... 2, 4

11

*Hill v. Nat'l Collegiate Athletic Assn.*,
  7 Cal. 4th 1 (1994) .......................................................................................................... 9

12

13

*Kristensen v. Credit Payment Servs. Inc.*,
  879 F.3d 1010 (9th Cir. 2018) ..................................................................................... 10

14

15

*Kristensen v. Credit Payment Servs. Inc.*,
  No. 2:12-CV-00528-APG, 2015 WL 4477425 (D. Nev. July 20, 2015) ..................... 12

16

*Perrong v. Victory Phones LLC*,
  No. CV 20-5317, 2021 WL 3007258 (E.D. Pa. July 15, 2021) ..................................... 7

17

18

*Sanchez-Scott v. Alza Pharms.*,
  86 Cal. App. 4th 365 (2001) ........................................................................................... 8

19

20

*Toney v. Quality Res., Inc.*,
  75 F. Supp. 3d 727 (N.D. Ill. 2014) ....................................................................... 2, 3, 4

21

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021) ................................................................................................. 7, 8

22

S<small>TATUTES</small>

23

Lanham Act ............................................................................................................................ 3

24

Telephone Consumer Protection Act ........................................................................... passim

25

26

27

28

1

## I.    INTRODUCTION

2

Plaintiff Deborah Schick's Opposition ("Opposition" or "Opp.") to Caliber's Motion for

3

Summary Judgment confirms this Court should grant summary judgment for Caliber. Schick's

4

claim, which seeks to hold Caliber liable for alleged violations of the Telephone Consumer

5

Protection Act ("TCPA") under 47 U.S.C. § 227(c) by Driving Force Media ("DFM"), fails as a

6

matter of law.

7

Schick argues that Caliber was involved in both calls because NexLevel Direct ("NLD")

8

and DFM were Caliber's telemarketing vendors and each of the two calls initiated by DFM to

9

Schick were made to sell Caliber's goods and services to Schick. In making this argument, Schick

10

ignores the undisputed evidence that Caliber did not know of DFM and forbade NLD from referring

11

to Caliber when NLD developed leads. Schick also ignores the evidence that NLD's process was

12

proprietary, the contract with Caliber governed the purchase of leads, not telemarketing, and NLD

13

(and DFM) could transfer a lead to other lenders besides Caliber. Only after confirming certain

14

criteria would DFM transfer a lead to Caliber. Schick also misstates the evidence. Specifically, she

15

describes the first call with DFM as "indicating her desire to not be contacted," referring to the

16

National Do Not Call Registry. The first call, however, lasted seven seconds and ended almost

17

immediately—with no discussion between DFM and Schick and no mention of Caliber. Schick

18

does not dispute that she lacks statutory standing to bring a claim under 47 U.S.C. § 227(c) if she

19

was called only once on behalf of Caliber. Therefore, Caliber is entitled to summary judgment

20

because the evidence shows that Caliber was involved in only one call.

21

Schick also argues she has standing because her purported injury is fairly traceable to

22

Caliber and she had an expectation of privacy sufficient to come within the TCPA's zone of

23

interests. In making these arguments, Schick ignores the evidence of her voluntary disclosure of

24

private information as a ruse to convince Adam at DFM to transfer the call to a lender. Schick did

25

not merely seek to enforce the TCPA; she sought to manufacture claims against a party that did not

26

call her. Her conduct eliminates any expectation of privacy vis-à-vis Caliber and takes her outside

27

the TCPA's zone of interests. Schick's purported injury is also not fairly traceable to Caliber

28

1  because Caliber forbade NLD from marketing on its behalf, required NLD to comply with
2  applicable law, and NLD (and DFM) could transfer leads to any lender at their sole discretion.

3      Finally, Schick does not dispute that vicarious liability by actual authority, apparent
4  authority or employment (respondeat superior) does not exist. Instead, Schick argues that Caliber
5  ratified DFM's calls and is required under FCC's *Dish Network* ruling to have investigated the
6  third-party telemarketers it hired. In making these arguments, Schick ignores the evidence that
7  Caliber did not hire NLD (or DFM) to telemarket on its behalf; misapplies *Dish Network*; and
8  misguidedly relies on the Ninth Circuit opinion in *Henderson*. The evidence shows that Caliber
9  never hired NLD to conduct telemarketing. Caliber forbade NLD from marketing Caliber. The
10  evidence also shows that Caliber did not know of DFM and never ratified DFM's purportedly
11  illegal calls.

12      For all these reasons, summary judgment should be entered in Caliber's favor on Schick's
13  only remaining TCPA claim.

14                          **II.    ARGUMENT**

15  **A.    Caliber is Entitled to Summary Judgment Because the Evidence Shows Caliber Was
        Involved in Only One Call**

16      Liability under the TCPA requires that Schick "received more than one telephone call
17  within any 12-month period by or on behalf of the same entity in violation of the regulations
18  prescribed under this subsection…" 47 U.S.C. § 227(c)(5). Schick does not dispute that her claim
19  fails if Caliber placed one, rather than two, calls. Instead, she argues that because Caliber was a
20  primary focus for DFM, Caliber was involved in both calls. Opp. at p. 11. The evidence establishes
21  otherwise.

22          **1.    The Evidence Shows DFM Did Not Discuss Any Criteria Necessary to
            Transfer the Call on November 21, 2019, to Caliber**
23

24      In her Opposition, Schick argues that "the first call was placed on Caliber's behalf" and
25  Caliber is therefore responsible "for ensuring the call was compliant with the TCPA." *See* Opp. at
26  12 (citing *Toney v. Quality Res., Inc.*, 75 F. Supp. 3d 727, 746 (N.D. Ill. 2014); *1-800 Contacts,*
27  *Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1250 (10th Cir. 2013); and *FTC v. Lifewatch Inc.*, 176 F.
28  Supp. 3d 757, 776 (N.D. Ill. 2016)). *Toney*, *1-800 Contract, Inc.*, and *Lifewatch* are inapposite and

- 2 -

Schick ignores evidence showing that no calls were made on behalf of a specific lender until DFM confirmed information to determine to which lender to transfer the call. Schick also ignores the fact that Caliber never contracted with DFM or knew of its existence—facts that further distinguish this case.

In *Toney*, the plaintiff purchased slippers online at Stompeez.com and provided her telephone number "for questions about [the] order." *Toney*, 75 F. Supp. 3d at 732. The plaintiff alleged that Stompeez misrepresented the purpose of requiring her telephone number. Instead of using it for questions about the order, "Stompeez had a contract with [co-defendant] Quality pursuant to which Quality purchased information about Stompeez's customers for approximately $1.50 per customer and then used the information to make telemarketing calls to sell the products and services of other parties, such as [co-defendants] Sempris and Provell" *Id.* The plaintiff received a series of calls made by an autodialer that traced back to Quality. *Id.* The plaintiff alleged that Quality had a business relationship with Sempris and Provell governed by a "Telemarketing Program Sales Agreement" that was "modified at least five times" by which Sempris required Quality to market Sempris' products "via outbound telemarketing." *Id.* Regarding the Do Not Call claim, Toney alleged that the three unanswered calls she received were "made by Quality at the direction of, and for the benefit of, Sempris/Provell." *Id*. at 746. In denying the motion to dismiss, the court held "The Third Amended Complaint contains sufficient factual allegations to plead a plausible basis for holding Sempris, LLC vicariously liable for the alleged misconduct of Quality Resources, Inc. under a formal agency theory, but not under theories of apparent authority or ratification." *Id.* at 746.

*1-800 Contacts, Inc.* concerned a Lanham Act claim regarding the use of Google AdWords to generate sponsored links in response to online searches for the phrase "1800 CONTACTS." *1-800 Contacts, Inc.*, 722 F.3d at 1235. When it searched using its name, 1-800 learned that sponsored links were generated for its rival, Lens.com. *Id.* at 1236. In response to a pre-litigation dispute notice from 1-800, Lens.com confirmed that one of its affiliates had purchased the AdWords responsible for the search results and "would advise them not to" use the AdWords in the future. *Id.* 1-800's concerns continued after confirming that sponsored links for Lens.com continued to be

- 3 -

generated based on searches using "1-800 Contacts" and similar permutations of the phrase. *Id.* at 1236-37. After receiving non-committal responses to follow-up letters, 1-800 filed suit. The Tenth Circuit affirmed summary judgment for Lens.com on all but one claim based on vicarious liability "because the evidence could support a reasonable finding that Lens.com did not take reasonable steps to halt the display of 1–800's marks in affiliate ads once it learned of such display." *Id.* at 1235.

In *Lifewatch*, the FTC alleged violations of, *inter alia,* the Telemarketing Sales Rule against Lifewatch, Inc. for abuses by its telemarketers. *Lifewatch, Inc.*, 176 F. Supp. 3d at 760. Lifewatch contracted with telemarketers to promote its products. *Id.* at 774 (noting contracts that Lifewatch required its telemarketers to sign). The FTC discovered telemarketing scripts for medical alert devices "riddled with misrepresentations" and confirmed that "Lifewatch was the only medical alert company working with" the telemarketers. *Id.* at 763. The court held that "[i]t matters that Lifewatch was the only medical alert company withing with the [telemarketers]." *Id.* In granting a preliminary injunction the court also concluded that the "weight of the evidence strongly suggests that the medical alert scripts … were used to sell Lifewatch's products and services…" and "there is strong and persuasive evidence establishing that Lifewatch was aware of, and responsible for, the [telemarketers'] illegal conduct." *Id.* at 764.

Unlike the contractually close relationships at issue in *Toney*, *1-800 Contacts, Inc.*, and *Lifewatch*, Caliber did not know of DFM and understood that NLD provided leads to multiple entities so NLD calls became calls on behalf of Caliber only after the decision was made by NLD to transfer a lead to Caliber. ECF No. 100-2 ¶ 21. In fact, Caliber had no control or knowledge regarding how NLD obtained the leads. *Id.* Caliber knew "very little" because NLD used a "proprietary model." ECF No. 102-1, Tab 3 at 19:15-18, 59:4-11 (explaining that NLD referred to their process as proprietary in the SOW), 69:17-24, 106:15-22. Caliber did not provide any telephone data to NLD (or DFM) or otherwise direct either entity to place a call to Schick. ECF No. 100-4 ¶ 5 (describing how DFM obtained Schick's number through a purchase of a data file from "Boss Leads"); ECF No. 100-1, Ex. B at 5 (DFM response to Interrogatory No. 17). The undisputed evidence further shows that DFM did not transfer all calls to Caliber, only those that

- 4 -

qualified. ECF No. 100-4 ¶ 4 (describing criteria for warm transfer leads), ¶ 11 (explaining that if a lead did not meet Caliber's criteria for purchasing leads it would be transferred to a different lender). Caliber's involvement with a lead began only after a call was transferred. ECF No. 100-2 ¶ 20.

Documents produced by DFM show that its first call to Schick lasted seven seconds. ECF No. 100-1, Ex. H. The recording of the call on November 21, 2019, shows a brief call with no mention of Caliber:

> DEBORAH SCHICK:        Hello?
> UNIDENTIFIED SPEAKER:Hello, Sidney? Hello?
> (End of recording.)

ECF No. 100-1, Ex. H at 2:1-3. The Gabster Declaration establishes that DFM would only transfer a call to Caliber if DFM confirmed certain criteria such as a minimum loan amount ($150,000); good or excellent credit; an intent to purchase or refinance a condo or single family residence; no late payments; no recent bankruptcies or foreclosure; a maximum loan to value ratio up to 80%; and an interest rate of 4.5% or higher. ECF No. 100-4 ¶ 4. Otherwise, DFM would send the lead to another lender. *Id.* ¶ 11. In the call on November 21, 2019, DFM discussed no criteria with Schick. Therefore, DFM could not transfer the call to Caliber because DFM could not meet the "specifics for Caliber" and would "route the call to another company." *Id.* ¶ 11.

Schick's argument that Caliber was involved in the call on November 21, 2019, is therefore speculative and cannot avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

### 2. Schick's Argument That NLD and DFM Were Telemarketing for Caliber Ignores the Evidence

Throughout the Opposition, Schick argues that NLD and DFM were telemarketing for Caliber. Opp. at pp. 1-10, 12-25 (referring to "telemarket" or "telemarketing" 115 times, excluding the table of contents). In making this argument, Schick ignores the evidence.

In its contract to purchase leads from NLD, Caliber expressly forbade NLD from marketing Caliber and prohibited NLD from using Caliber's name, logos, trademarks, or any information

about Caliber. ECF No. 100-2, Ex. A § 2.m. Caliber's involvement in any particular call began only after the call was transferred to Caliber. ECF No. 100-2 ¶ 20. In cross examination, Matthew Kopil confirmed this—Schick asked whether Caliber retained NLD "to conduct telemarketing" on Caliber's behalf and Mr. Kopil said "No, not to conduct telemarketing..." ECF No. 102-1, Tab 3 at 18:21-19:1, 112:19-22 ("They [NLD] are not marketing on our behalf). Schick also asked Mr. Kopil whether Caliber knew that NLD would be "placing telephone calls" on behalf of Caliber and Mr. Kopil answered that Caliber knew NLD would be "transferring potential clients … via phone." *Id.* at 19:6-13. In fact, Caliber knew "very little" about how NLD would find potential clients because NLD's model was proprietary. *Id.* at 19:15-18. Caliber did not know whether the leads it received began with a call from the lead to NLD or by a call from NLD to the lead. *Id.* at 112:23-114:3.

Caliber provided no telephone data to NLD or DFM and did not cause either entity to call any phone numbers. ECF No. 100-2 ¶ 19; ECF No. 100-4 ¶ 5 (describing how DFM obtained Schick's number through a purchase of a data file from "Boss Leads"); ECF No. 100-1, Ex. B at 5 (DFM response to Interrogatory No. 17). Caliber did not engage NLD or DFM as a vendor to make telemarketing calls for Caliber either. ECF No. 100-2 ¶ 9. Rather, Caliber purchased leads in the form of live transfer leads. For this reason too, Schick's legal contention that both calls were on Caliber's behalf fails.

**B.     Caliber is Entitled to Summary Judgment Because Schick Lacks Standing**

In her Opposition, Schick argues that the traceability argument "is merely a spin" on vicarious liability (Opp. at p. 12) and the concreteness argument "has been decisively rejected by the Ninth Circuit" (Opp. at p. 13). In making these arguments, Schick misstates Caliber's Motion, ignores the evidence, and relies on distinguishable cases.

The call on November 21, 2019, is not traceable to Caliber because DFM was transferring calls to multiple lead buyers and would only transfer a lead to Caliber if it met certain criteria. The call lasted seven seconds during which there was no discussion between DFM and Schick. ECF No. 100-1, Ex. H at 2:1-3. There is no way that call would have transferred to Caliber. ECF No. 100-4 ¶ 4 (discussing criteria for transferring a lead to Caliber), ¶ 5 (discussing DFM's purchase of telephone numbers from "Boss Leads"), ¶ 11 (discussing DFM's supplying of leads to 4 to 6 other

- 6 -

companies and that leads would be routed to those companies when Caliber's criteria was not met). Schick speculates that DFM would have transferred that call to Caliber because DFM viewed Caliber as the "primary" target. But her argument is only speculation and ignores salient parts of the Gabster Declaration that establishes DFM had other clients and could transfer a lead to those other clients. *See id.*

The call on November 26, 2019, is not traceable to Caliber either. Schick's opposition brief confirms this. Schick argues that she had to share her private information to identify Caliber as the responsible party because Caliber had precluded NLD from marketing Caliber and prohibited NLD from using Caliber's name, logos, trademarks, or any information about Caliber. *See* Opp. at p. 13 ("Of course, because Caliber instructed NexLevel not to identify Caliber as the entity being promoted prior to the transfer of a call to Caliber, Ms. Schick . . . had to agree[] to a transfer to confirm Caliber's involvement"). But this only confirms that Adam at DFM made no attempt to "promote" Caliber. *See* ECF No. 100-1, Ex. C (transcript of call by Adam to Schick on November 26). It follows that Caliber did not hire NLD (let alone DFM) to market or promote Caliber, *not* that Caliber did. ECF No. 102-1, Tab 3 at 18:21-19:13, 112:19-22, 113:19-114:3. Indeed, under Schick's self-serving logic, Caliber should be liable *for not using* NLD as its telemarketer.[1]

Schick also argues that courts have repeatedly rejected standing arguments based on a plaintiff's conduct in bringing about the claim. Opp. at 13 n.5. In making this argument, Schick relies on distinguishable cases decided before the Supreme Court decision in *TransUnion v. Ramirez*. For example, at issue in *Perrong* was whether a TCPA plaintiff who "so frequently alleged violations of the TCPA that he has turned himself into something of a professional plaintiff" came within the TCPA's zone of interests. *Perrong v. Victory Phones LLC*, No. CV 20-5317, 2021 WL 3007258, at *4 (E.D. Pa. July 15, 2021).The court found that on the defendant's motion to dismiss the plaintiff had stated sufficient facts to show standing. But the plaintiff in *Perrong* did not "play along" to identify a non-caller; rather, at issue was a single pre-recorded message. *Id*. at *1. Caliber's Motion is based on Schick's self-inflicted injury, not the fact that she is a serial

---

[1] While Schick fails to establish a basis to hold Caliber liable, Schick is not without recourse because she can pursue her claim against DFM as there is no dispute DFM called her twice.

CALIBER HOME LOANS, INC.'S REPLY ISO MOTION FOR SUMMARY JUDGMENT

1   TCPA plaintiff.

2       The nature of Schick's self-inflicted injury goes to the heart of her lack of standing. "[W]ith

3   respect to the concrete-harm requirement in particular … courts should assess whether the alleged

4   injury … has a close relationship to a harm traditionally recognized as providing a basis for a

5   lawsuit in American courts." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citations

6   and quotations omitted). "In enacting the TCPA, Congress found that banning robocalls was 'the

7   only effective means of protecting telephone consumers from' the nuisance and privacy invasion

8   that they caused." *Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S. Ct. 2335, 2344 (2020) (citing

9   TCPA § 2, ¶12, 105 Stat. 2394).

10      The record shows that Schick was not concerned about her privacy interest. She disclosed

11  private financial information regarding whether she had other loans, the equity in the property, and

12  her credit rating. ECF No. 100-1, Ex. C at 3:23-5:8; ECF No. 100-1, Ex. E at 98:11-21, 127:6-15,

13  162:10-24. Schick told Adam about her payment history, lack of foreclosures, and lack of

14  bankruptcies. ECF No. 100-1, Ex. C at 5:4-8. Schick disclosed their military status. *Id.*, Ex. C at

15  5:12-15. She also told Adam about her husband's line of work (consulting), talked about whether

16  his income was documented by a W-2 or 1099, and confirmed they have to pay taxes. *Id.*, Ex. C at

17  5:16-6:3.

18      To determine whether an injury is sufficiently concrete, courts must look to the "history and

19  tradition [as] a meaningful guide to the types of cases that Article III empowers federal courts to

20  consider." *TransUnion LLC*, 141 S. Ct. at 2204. The *TransUnion* court "rejected the proposition

21  that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a

22  person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* at

23  2205 (citation and quotation omitted).

24      Schick pins her claim on invasion of privacy. FAC ¶ 58. However, by offering private

25  information, Schick consented to the consequence of the additional purported invasion of privacy

26  resulting from Adam calling Caliber on her behalf. *Sanchez-Scott v. Alza Pharms.*, 86 Cal. App.

27  4th 365, 376 (2001) ("The maxim of law that one 'who consents to an act is not wronged by it'

28  applies to the tort of invasion of privacy."). "[T]he plaintiff in an invasion of privacy case must

- 8 -

1   have conducted himself or herself in a manner consistent with an actual expectation of privacy, i.e.,

2   he or she must not have manifested by his or her conduct a voluntary consent to the invasive actions

3   of defendant." *Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 26 (1994). Here, Schick

4   consented to any invasion of privacy occasioned by the transfer to Caliber and she did not

5   reasonably expect privacy. Therefore, Schick cannot establish a concrete injury by the call on

6   November 26, 2019.

7   **C.    Caliber is Entitled to Summary Judgment Because Schick Fails to Establish an Agency Relationship Between Caliber and DFM**

8
9       Schick does not dispute that no agency relationship existed between Caliber and DFM based

10  on actual authority, apparent authority, or employment (respondeat superior). *See* Opp. Instead,

11  Schick argues that an agency relationship existed under a theory of ratification. In making this

12  argument, Schick interprets *Dish Network* to hold that companies that can stop TCPA violations

13  but fail to do so may be vicariously liable. Opp. at p. 16. Schick misstates *Dish Network* and the

14  holding of *Henderson*'s interpretation of *Dish Network*. Schick also, again, ignores the evidence.

15      **1.    Schick Offers No Evidence to Show That Caliber Ratified DFM's Purported Violations of the TCPA and Schick's Interpretation of *Dish Network* is Wrong**

16      The undisputed evidence shows that Caliber did not know of DFM. ECF No. 100-2 ¶¶ 5-6;

17  ECF No. 100-1, Ex. B at pp. 3-6, 10 (DFM responses to Interrogatory Nos. 4, 10-12, 18-20 and

18  DFM response to Request for Admission No. 2); *see also* ECF No. 100-3 ¶¶ 6-7. Despite NLD's

19  contractual obligation to notify Caliber and obtain its approval before using any subcontractor,

20  NLD never notified Caliber that NLD was using DFM to provide leads to Caliber. ECF No. 100-2

21  ¶¶ 22-23; ECF No. 100-3 ¶¶ 6-7; *see* ECF No. 100-1, Ex. B at p. 4 (DFM response to Interrogatory

22  No. 12). In discovery, DFM testified that Caliber exerted no control over DFM, had no authority

23  over DFM, never controlled DFM's day-to-day activities, and never instructed DFM about what

24  numbers to call. ECF 100-1, Ex. B at pp. 10-11 (DFM responses to Request for Admission Nos. 3-

25  6, 8, 11); *see* ECF No. 100-3 ¶ 8. NLD's process was proprietary, and Caliber knew little about

26  how NLD acquired the leads it sold to Caliber. *See* ECF No. 102-1, Tab 3 at 19:15-18, 59:4-11,

27  69:17-20; 79:1-80:9; 106:15-22.

28      Schick testified that she cannot prove a connection between Caliber and DFM. ECF No.

100-1, Ex. C 142:5-21, 144:25-146:2. Schick's Opposition confirms this fact. In her Opposition, Schick offers no evidence that Caliber knew of DFM or its purportedly illegal calls. Instead, Schick asserts facts about NLD only. *See* Opp. at pp. 2-3. Schick argues that Caliber should have investigated NLD more before agreeing to purchase leads from NLD. *See* Opp. at pp. 4-8. In making the argument, Schick ignores the law to avoid the overwhelming evidence showing that NLD's process was proprietary and NLD left Caliber in the dark about its processes, including its use of DFM.

Citing *Dish Network* at 6588, Schick contends that the FCC rule on vicarious liability requires Caliber to investigate NLD, since it is a "third-party telemarketer"—imposing a standard that would go beyond federal common law principles of vicarious liability. Opp. at p. 17. There are at least four problems with Schick's interpretation of *Dish Network*.

*First*, the FCC has expressly rejected Schick's interpretation:

> 31. A number of parties argue that statutory "on behalf of" liability extends beyond agency principles to subject the seller to vicarious liability for violations of both section 227(c) and section 227(b) so long as the call is made simply to aid or benefit the seller — even if agency principles would not impose vicarious liability on the seller for the call. **We reject these contentions for purposes of this declaratory ruling proceeding.**

*Dish Network* at 6585-6586 ¶ 31 (emphasis added); *see also Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) ("[t]he FCC relies on the Restatement (Third) of Agency as the federal common law of agency").

*Second*, even if Caliber's failure to investigate NLD were enough to transform NLD into Caliber's agent—which it is not—it does not follow that DFM would, in turn, be Caliber's agent as well. As Schick admits, there is no evidence tying DFM, the entity that placed the calls, to Caliber. ECF No. 100-1, Ex. E at 142:5-21, 144:25-146:2 (Schick testimony admitting she cannot prove an affiliation between Caliber and DFM). Instead, the evidence shows that Caliber prohibited NLD from using subcontractors. ECF No. 100-2 ¶ 15, Ex. A § 2(b).

*Third*, had Caliber investigated NLD at the first opportunity, it would not have discovered DFM. There is no evidence that the test leads NLD provided to Caliber involved DFM. Even if they involved DFM, NLD maintained a proprietary model. ECF 102-1, Tab 3 at 19:15-18, 59:4-11

(explaining that NLD referred to their process as proprietary in the SOW), 69:17-24, 106:15-22. Had Caliber investigated those leads further it might have resulted in changes to the website that DFM was using to obtain leads to provide additional TCPA disclosures, for example, but it would not have resulted in the discovery of DFM. How DFM could become Caliber's agent based on a "failure to investigate" theory is therefore nonsensical.

*Finally*, *even* had the FCC adopted Schick's broader-than-federal-common-law approach—which it did not—NLD was not a third-party telemarketer for Caliber, so the FCC standard would not apply here. *See*, *supra*, Section II.A.2. The evidence shows that Caliber did not contract with NLD for any marketing. ECF No. 102-1, Tab 3 at 18:21-19:1, 78:19-23, 87:10-17; ECF No. 100-2 ¶¶ 8-10. Rather, Caliber purchased leads from NLD understanding that those leads would comply with applicable law and that NLD could sell any lead it obtained to any of its customers, at NLD's sole discretion. ECF No. 100-2 ¶¶ 13-17, 21, Ex. A-B; ECF No. 100-4 ¶ 11 (DFM had the prerogative to transfer calls to other lenders if a lead did not meet the criteria for Caliber).

### 2.   The Ninth Circuit Opinion in *Henderson* Does Not Support the Finding of Ratification Either

Citing *Henderson v. United Student Aid Funds, Inc.*, Schick argues that "the Ninth Circuit made clear that by ratifying the acts of a telemarketer, even when an agency relationship did not otherwise exist, a principal can thereby create an agency relationship that supports imposition of vicarious liability…" Opp. at p. 17. There are several flaws with Schick's argument.

*First*, Caliber could not ratify an act of a telemarketer because it did not hire NLD to conduct telemarketing. *See*, *supra*, Section II.A.2.

*Second*, Caliber did not ratify NLD, or DFM, to initiate calls on Caliber's behalf that would violate the TCPA or National Do Not Call Registry. The evidence shows that Caliber required NLD to comply with applicable law and provide only TCPA-compliant leads. ECF No. 100-2 ¶ 13 (describing contract with NLD in which NLD agreed to comply with "all applicable federal, state, and local laws, regulations and ordinances"), ¶ 14 (describing statement of work with NLD in which NLD agreed to provide Caliber only leads from "TCPA compliant data records). Thus, even if Caliber had hired NLD as a telemarketer—which it did not—NLD promised to comply with

- 11 -

applicable law. The mere purchase of a live transfer lead does not support apparent authority. *See Kristensen v. Credit Payment Servs. Inc.*, No. 2:12-CV-00528-APG, 2015 WL 4477425, at *5-6 (D. Nev. July 20, 2015).

*Third*, the evidence shows that Caliber had no intention of adopting or approving DFM's purported violations of the TCPA. Citing *Doe v. Starbuck*, Schick argues that "[a]nything which convincingly shows the intention of the principal to adopt or approve the act in question is sufficient." Opp. at p. 18. The evidence shows that Caliber's only intent was to purchase leads from NLD that complied with the law. ECF No. 100-2 ¶ 15, Ex. A § 2(b). Schick provides no evidence to support the conclusion that Caliber intended to adopt or approve of DFM's violations. The evidence supports only one conclusion: that Caliber's intention was to purchase legal leads; nothing more.

*Fourth*, Schick argues in the alternative that Caliber ratified DFM's violations of the TCPA because it turned "a blind eye" to what DFM was doing. Opp. at pp. 24-25. Schick offers only speculation that had Caliber "conducted even the most basic of due diligence" it would have learned of NLD's illicit use of DFM as a subcontractor. Schick fails to identify any legal authority that would require Caliber to have engaged in a more closely integrated contractual relationship with NLD. Indeed, the FCC expressly rejected this notion in *Dish Network*. Nothing in the TCPA authorizes courts to draft a party into the role of policing third party conduct as Schick suggests in her Opposition. Caliber clearly communicated to NLD that its purchase of leads was in reliance on NLD's promises that it would comply with the law. Caliber forbade NLD from marketing Caliber or its products or hiring subcontractors. While Schick may have a claim against DFM for violating 47 U.S.C. § 227(c), the evidence shows that she has no basis for a claim against Caliber.

*Fifth,* Schick's interpretation and application of the *Henderson* opinion is misguided. *See* Opp. at pp. 18-20. *Henderson* concerned telephone calls to borrowers of defaulted student loan debt. *Henderson*, 918 F.3d at 1070. USA Funds owned the student loan debt, Navient serviced the debt on behalf of USA Funds, and the debt collectors hired by Navient had authority to negotiate, defer, and take payments on USA Funds' behalf. *Id.* at 1070, 1074. USA Funds knew in 2000, 2009, and 2010, that debt collectors hired by Navient had "called borrowers on phone numbers that

they did not consent to be called on" and USA Funds noted the "improper collection practices" and recommended "corrective action." *Id.* at 1071. USA Funds' contract with Navient did not permit USA Funds to fire the debt collectors directly, but USA Funds could ask Navient to replace them and USA Funds could have fired Navient if it did not comply. *Id.* "Navient, however, continued to use these debt collectors, and USA Funds did not object when the same debt collectors were used in the following years." *Id.* "Moreover, USA Funds was aware that debt collectors handling USA Funds' loans had been sued regarding their calling practices but USA Funds did nothing to ensure TCPA compliance." *Id.*

Here, there is no such connection between Caliber and DFM. Unlike in *Henderson*, there is no evidence that DFM held itself out as Caliber's agent. *See* ECF No. 100-1, Ex. C, H. DFM never told Schick it was calling on Caliber's behalf. *Id.* On the first call, there was no discussion between DFM and Schick and no mention of Caliber. ECF No. 100-1, Ex. H. On the second call, Adam did not mention Caliber until he transferred the call. ECF No. 100-1, Ex. C. DFM did not make calls specifically on Caliber's behalf either. ECF No. 100-4 ¶ 11, ECF No. 100-2 ¶ 21. And, Caliber had no affiliation with DFM and no knowledge of DFM's involvement before learning of Schick's allegations. ECF No. 100-2 ¶¶ 5-6, 27; ECF No. 100-1, Ex. B at pp. 3-6, 10 (DFM responses to Interrogatory Nos. 4, 10-12, 18-20 and DFM response to Request for Admission No. 2); *see also* ECF No. 100-3 ¶¶ 6-7. In addition, contrary to the contractual relationships binding USA Funds, Navient, and the debt collectors in *Henderson*, the contract between Caliber and NLD prohibited NLD from hiring subcontractors such as DFM. ECF No. 100-2 ¶ 15, Ex. A § 2(b).

The timing of complaints further distinguishes this case from *Henderson*. While USA Funds had knowledge of its debt collectors' violations of the TCPA for more than ten years and *never* terminated its use of Navient as a loan servicer, Caliber ceased buying leads from NLD within 60 days of learning of the Schick and Connor complaints. In December 2019, Caliber learned of an alleged violation of the TCPA resulting from the call Adam Kinsella transferred to Caliber on Schick's behalf. ECF No. 100-2 ¶ 27. As a result of that allegation, Caliber asked NLD to confirm its compliance with the TCPA for that lead. *Id.* When NLD could not provide such confirmation, Caliber ceased purchasing leads from NLD in January 2020. *Id.*; ECF No. 100-3 ¶ 11. Schick argues

- 13 -

that Caliber also received notice of a complaint by Jay Connor in December 2019. Opp. at p. 6. In response to that complaint, Caliber also asked NLD for proof of its compliance with applicable law. *Id.* Unlike with Schick, NLD was able to provide proof of compliance by providing a Jornaya token. *See* ECF No. 102-1, Tab 6 (CHL002799) (email from B. Borneman to Matthew Kopil providing Jornaya token indicating that Mr. Connor's telephone number was not on the National Do Not Call Registry). The duration between the nearly simultaneous Connor and Schick complaints in December 2019 on the one hand and Caliber's termination of its purchase of leads from NLD in January 2020 on the other hand is a far cry from the over 10-year period at issue in *Henderson*. Simply put, when NLD failed to provide proof that its lead relating to Schick complied with applicable law, Caliber pulled the plug within weeks.

To draw parallels between USA Funds' knowledge of, and acquiescence to, the TCPA violations of Navient's debt collectors between 2000 and 2010, Schick also argues that Caliber had numerous red flags during its initial review of NLD in August 2019, to warrant a deep dive examination of NLD's processes. *See* Opp. at pp. 2-4, 19-20. Schick cites to one test lead referring to being on the DNC. *Id.* at p. 19. In making this argument, Schick attempts to impose a duty that Caliber engage in a broader relationship with NLD instead of the contract to purchase leads. The evidence shows that Caliber agreed only to purchase leads from NLD, and that such leads comply with law. ECF No. 100-2 ¶ 15, Ex. A § 2(b). The evidence further shows that when one of the ten test leads referred to being on the DNC, Caliber told NLD it was unacceptable. ECF No. 102-1, Tab 2 (email from S. Ruther to B. Borneman dated August 19, 2019). Schick attempts to portray three other test leads as DNC violations because each lead said they were "not interested." Opp. at p. 3. However, Schick provides no evidence to support her speculation that "not interested" means those three leads were on the National Do Not Call Registry.

### III.   CONCLUSION

Schick fails to establish that Caliber was involved in more than one call within a 12-month period. Under 47 U.S.C. § 227(c)(5), Schick's claim against Caliber must fail. Schick's argument that she has standing is equally flawed because she ignores evidence that she had no reasonable expectation of privacy. Schick concedes that Caliber is not vicariously liable under theories of

- 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

agency based on actual authority, apparent authority, or employment (respondeat superior). Schick's argument that Caliber ratified DFM's violations of the TCPA are contradicted by the evidence. Any of these reasons is ample grounds to grant summary judgment to Caliber.

DATED: August 13, 2021

**PERKINS COIE LLP**

By: /s/ Thomas N. Abbott
    David T. Biderman, Bar No. 101577
    DBiderman@perkinscoie.com
    Kristine E. Kruger, Bar No. 253593
    KKruger@perkinscoie.com
    Thomas N. Abbott, Bar No. 245568
    TAbbott@perkinscoie.com

Attorneys for Defendant
Caliber Home Loans, Inc.

**PROOF OF SERVICE**

1

2   I, Matthew Walkup, declare:

3   I am a citizen of the United States and employed in San Francisco, California. I am over
the age of eighteen years and not a party to the within-entitled action. My business address is 505
4   Howard Street, Suite 1000, San Francisco, CA 94105-3204.

5   On August 13, 2021, I electronically filed the attached document:

6   DEFENDANT CALIBER HOME LOANS, INC.'S REPLY ISO
MOTION FOR SUMMARY JUDGMENT

7   with the Clerk of the court using the CM/ECF system which will then send a notification of such
8   filing to the following:

9   Adam J. Schwartz                         *Attorneys for Plaintiff*
Adam J. Schwartz, Attorney at Law           Debora Schick
10   5670 Wilshire Boulevard, Suite 1800
Los Angeles, CA 90036
11   (323) 455-4016
adam@ajschwartzlaw.com
12

13   Edward A. Broderick                      *Attorneys for Plaintiff*
Broderick Law, P.C.                         Debora Schick
14   99 High Street, Suite 304
Boston, MA 02110
15   (617) 738-7080
(617) 830-0327 (fax)
16   ted@broderick-law.com

17   Jon Bernhard Fougner                     *Attorneys for Plaintiff*
18   600 California Street, 11th Floor         Debora Schick
San Francisco, CA 94108
19   (415) 577-5829
(206) 338-0783 (fax)
20   Jon@FougnerLaw.com

21   Andrew Heidarpour                        *Attorneys for Plaintiff*
22   Heidarpour Law Firm, PLLC                Debora Schick
1300 Pennsylvania Avenue NW, 190-318
23   Washington, DC 20004
(202) 234-2727
24   AHeidarpour@HLFirm.com

25

26

27

28
                                  - 16 -

| | | |
|---|---|---|
| 1 | Charlotte Fernee Kelly | *Attorneys for Plaintiff* |
| | Fernee Kelly Law | Debora Schick |
| 2 | 1228 East 7th Avenue, Suite 200 | |
| | Tampa, FL 33605 | |
| 3 | (813) 315-3981 | |
| | charlotte@ferneekellylaw.com | |
| 4 | | |
| 5 | Matthew Passi McCue | *Attorneys for Plaintiff* |
| | The Law Office of Matthew P. McCue | Debora Schick |
| 6 | 1 South Avenue, Suite 3 | |
| | Natick, MA 01760 | |
| 7 | (508) 655-1415 | |
| | (508) 319-3077 (fax) | |
| 8 | mmccue@massattorneys.net | |
| 9 | | |
| | Anthony I. Paronich | *Attorneys for Plaintiff* |
| 10 | Paronich Law, P.C. | Debora Schick |
| | 350 Lincoln Street, Suite 2400 | |
| 11 | Hingham, MA 02043 | |
| | (617) 485-0018 | |
| 12 | (617) 830-0327 (fax) | |
| | anthony@paronichlaw.com | |
| 13 | | |
| 14 | Debbie Paulerio Kirkpatrick | *Attorneys for Defendants* |
| | James K. Schultz | Driving Force Media and |
| 15 | Sessions Fishman Nathan & Israel, LLP | Barry Gabster |
| | 1545 Hotel Circle South, Suite 150 | |
| 16 | San Diego, CA 92108 | |
| | (619) 758-1891 | |
| 17 | (619) 296-2013 (fax) | |
| | dkirkpatrick@sessions.legal | |
| 18 | jschultz@sessions.legal | |
| 19 | | |
| 20 | Seth W. Wiener | *Attorneys for Defendant* |
| | Law Offices of Seth W. Wiener | NexLevel Direct LLC |
| 21 | 609 Karina Court | |
| | San Ramon, CA 94582 | |
| 22 | (925) 487-5607 | |
| | seth@sethwienerlaw.com | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

- 17 -

CALIBER HOME LOANS, INC.'S REPLY ISO MOTION FOR SUMMARY JUDGMENT

1    I declare that I am employed in the office of a member of the bar of this court at whose
direction the service was made.

2

    Executed on August 13, 2021, at Castro Valley, California.

3

4                                    */s/ Matthew Walkup*

5                                    Matthew Walkup, Legal Practice Assistant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CALIBER HOME LOANS, INC.'S REPLY ISO MOTION FOR SUMMARY JUDGMENT